Harmony Dairy Company v. Commissioner.
Harmony Dairy Co. v. Commissioner
Docket Nos. 76486, 82566.
United States Tax Court
T.C. Memo 1960-109; 1960 Tax Ct. Memo LEXIS 174; 19 T.C.M. (CCH) 582; T.C.M. (RIA) 60109; May 31, 1960
Robert G. MacAlister, Esq., 3700 Grant Building, Pittsburgh, Pa., Albert Duff Brandon, Esq., and Frank E. Coho, Esq., for the petitioner. Gerald Backer, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: These consolidated proceedings involve deficiencies in income and excess profits taxes in the amounts and for the years as set forth below: Docket
Fiscal Year Ended
No.
September 30
Deficiency
76486
1951
$17,624.44
1952
21,055.55
1953
9,081.35
1954
24,393.61
1955
9,328.85
82566
1956
12,547.15
1957
4,767.28
The issues for decision are: (1) Whether payments made by petitioner to purchasers of its milk and milk products constituted rebates which may be used to reduce its gross sales in determining gross profit *175 from sales; if not (2) whether these payments were deductible as ordinary and necessary business expenses; (3) whether the cost of milk and milk products delivered by petitioner free-of-charge to its officer-stockholders was deductible as an ordinary and necessary business expense. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Harmony Dairy Company, petitioner herein, is a Pennsylvania corporation with offices in Pittsburgh. It kept its books and filed its Federal income tax returns on an accrual basis. Its return for the taxable year ended September 30, 1951 was filed with the collector of internal revenue for the twenty-third district of Pennsylvania. Returns for the other years in issue were filed with the district director of internal revenue at Pittsburgh. As a milk dealer licensed under the Pennsylvania Milk Control Law [1] petitioner engaged in the sale of fluid milk, milk products, and other products at both the wholesale and retail level. Insofar as material herein, section 807 of that law provided: "No method or device shall *176 be lawful whereby milk is bought * * * sold or handled or delivered or made available on consignment or otherwise, * * * at a price less than the minimum price applicable to the particular transaction, whether by any discount, premium, rebate, free service, trading stamps, advertising allowance, or extension of credit, or by a combined price for such milk, together with another commodity or a service which is less, or is represented to be less, than the aggregate of the price of the milk and the price or value of such commodity or service when * * * sold or delivered or made available * * * separately or otherwise." Petitioner sold its products on both a cash and credit basis. Those products subject to price control under the Milk Control Law were sold at the minimum prices provided by that law. Other products were sold at market prices. On this basis its customers were charged and billed for the products purchased, and paid the amounts so billed. Pursuant to prior agreements with its wholesale customers, petitioner, after the close of each month, made cash payments to them based upon a specific percentage of the total amounts *177 billed to and paid by the customer during the month for products purchased. The percentages varied from month to month, and as between customers. By virtue of this arrangement, the wholesale customer knew that the net charge for any controlled product would be less than the minimum price provided therefor by the Milk Control Law. These payments were motivated, in part, by an expectation that the customer would sell more of its products. If the sales potential expected did not materialize in a particular customer's area, the customer was notified that the payment arrangement was to be discontinued. In 1950, petitioner created Advance Advertisers. Though this company was owned and operated by and for the benefit of the petitioner, it was registered under the Pennsylvania Fictitious Names Act as a sole proprietorship conducted by an employee of petitioner to whom the task of running the concern had been assigned. While serving in this capacity, this employee remained on petitioner's payroll. Advance Advertisers was used to effect most of the cash payments made by petitioner to its customers. Each month, one of petitioner's officers prepared a list of customers who were to receive these *178 payments, and the respective amounts to be paid. These lists were transmitted to Advance Advertisers, which drew checks on its own bank account in favor of the particular customers involved. The funds in this account were supplied by the petitioner. In some instances, checks were made payable to cash or to the order of the individual conducting Advance Advertisers' affairs, the monies then being transferred by him directly to the customer. In other instances, checks were made payable to an employee of the particular customer to whom payment was being made. Advance Advertisers kept no books, records, or analyses of the expenditures which it made. However it did retain its cancelled checks. In addition to customer payments made through the medium of Advance Advertisers, petitioner made certain payments directly to its customers during each of the years 1951, 1952, 1955, 1956 and 1957. Sometime in 1955, petitioner discontinued the use of Advance Advertisers as a means of handling its cash payments to customers. Thereafter, it made these payments directly to the customer, utilizing a bank account separate and distinct from that which it maintained for the greatest portion of its business *179 transactions. On its books petitioner carried the disbursements which it made to Advance Advertisers under accounts variously labeled "Advertising", "Allowances and Returns", and "Contributions and Donations." The amounts expended by it on direct payments to its customers were carried under accounts designated "Allowances and Returns" and "Selling Expense." In addition to the payments made pursuant to its agreements with its wholesale customers, petitioner disbursed monies to various individuals, organizations and concerns which were not customers. These disbursements primarily were made through the medium of Advance Advertisers, and were classified either as an advertising or operational expense. The advertising expenditures included disbursements to various church organizations, parent-teacher associations, sports organizations, veteran groups, magazines, periodicals, and expenditures termed general good will. The operational expenditures included charges to Advance Advertisers for banking services, an expense allowance for its manager, the cost of flowers purchased for various occasions, and the cost of school lunch envelopes provided for school children. In addition, petitioner *180 made certain direct payments to non-customers during the years in issue which are now in dispute. During its fiscal year ended September 30, 1952 it expended $650 on a display advertising its products which it installed at the Greater Pittsburgh Airport. During its fiscal year ended September 30, it disbursed $25 to a religious organization which it classified as an advertising expense, and $28.68 on what it termed operational expenses. The largest non-customer expenditure incurred directly by petitioner was the cost of milk and milk products which it delivered free-of-charge to its officer-stockholders during its fiscal years ended September 30, 1956 and 1957. Petitioner estimated the cost of the products so delivered at $1,200 for each of those years, and considered the expenditure to be in the nature of a fringe benefit. These amounts were reported by it as "Returns and Allowances" and utilized to reduce its gross sales. The recipients of these products included no amount with respect thereto in their personal income tax returns. During the years in issue petitioner's stock was held equally by Robert E., Howard L. and James A. Thompson, its president, vice-president and treasurer, *181 respectively. The amounts advanced by petitioner to the account of Advance Advertisers, the disbursements made by petitioner, either through that entity or directly for the items here in issue, and the manner in which those disbursements were returned by it during the years in issue were as set forth below: FISCAL YEAR ENDED SEPTEMBER 30
1951
1952
1953
To Advance Advertisers
$28,300.00
$23,100.00
$14,050.00
Disbursements: Advance Advertisers
Customer payments
26,673.79
20,693.59
8,497.18
Customer loan
750.00
Payments to non-customers
385.20
1,406.62
2,713.37
classified "Advertising"
Payments to non-customers
435.55
1,337.20
1,961.78
classified "Operating Expense"
Total
$27,494.54
$23,437.41
$13,922.33
Petitioner
Customer payments
$ 1,940.36 [1]
$1,908.88
Payments to non-customers
classified "Advertising"
Payments to non-customers
classified "Operating Expense"
Cost of refrigerator placed in
customer's store
Advertising Display
650.00
Products furnished
officerstockholders
Total
$ 1,940.36
$ 2,558.88
Total Disbursements
$29,434.90
$25,996.29
$13,922.33
Returned As: Returns and Allowances [2]
$28,300.00
$21,000.00
$ 8,149.66
Selling Expense
1,940.36
1,908.88
Advertising
2,750.00
4,590.69
Contributions and Donations
318.60
Other Deductions
991.05 [4]
Total [5]
$30,240.36
$25,658.88
$14,050.00
*182 FISCAL YEAR ENDED SEPTEMBER 30
1954
1955
1956
1957
To Advance Advertisers
$12,550.00
$ 63.68
Disbursements: Advance Advertisers
Customer payments
9,087.66
56.07
Customer loan
Payments to non-customers
2,332.24
classified "Advertising"
Payments to non-customers
1,808.24
7.61
classified "Operating Expense"
Total
$13,228.14
$ 63.68
Petitioner
Customer payments
$8,291.23
$8,042.74
$5,834.55
Payments to non-customers
25.00
classified "Advertising"
Payments to non-customers
28.68
classified "Operating Expense"
Cost of refrigerator placed in
211.50
customer's store
Advertising Display
Products furnished
1,200.00
1,200.00
officerstockholders
Total
$8,556.41
$9,242.74
$7,034.55
Total Disbursements
$13,228.14
$8,620.09
$9,242.74
$7,034.55
Returned As: Returns and Allowances [2]
$ 8,871.96
$7,808.17
$8,482.23 [3]
$7,034.55
Selling Expense
811.92
Advertising
2,001.95
Contributions and Donations
1,676.09
Other Deductions
760.51
Total [5]
$12,550.00
$8,620.09
$9,242.74
$7,034.55
*183 The customer payments made by petitioner, either directly or through the medium of Advance Advertisers, during each of the years here in issue constituted rebates of purchase price made pursuant to agreements with those customers, and were intended to reduce the charges for the products sold below the specified gross price in an amount equal to the rebate. The rebates so made by petitioner for each of the years in issue were as set forth below: Fiscal Year Ended
September 30
Rebate
1951
$28,614.15
1952
22,602.47
1953
8,497.18
1954
9,087.66
1955
8,347.30
1956
8,042.74
1957
5,834.55
Opinion The principal issue in this proceeding concerns the customer payments made by petitioner during the years in issue, either directly or through the medium of its alter ego, Advance Advertisers. In the main, petitioner contends these payments did not constitute income to it upon their initial receipt, and thus are properly to be used to reduce Gross Sales in arriving at its Gross Profits from sales for Federal tax purposes, citing Pittsburgh Milk Co., 26 T.C. 707 (1956). In the alternative, it contends these payments were deductible as ordinary and *184 necessary business expenses. On the other hand, respondent argues the customer payments do not come within the ambit of Pittsburgh Milk, supra, and, if they do, that case was incorrectly decided. In answer to petitioner's alternative position, he argues the payments were made in direct violation of the public policy of the Commonwealth of Pennsylvania as defined in its Milk Control Law, and thus can not be held deductible as ordinary and necessary business expenses. Tank Truck Rentals, Inc. v. Commissioner, 356 U.S. 30 (1958). In Pittsburgh Milk, supra, we were confronted with the tax effect of rebates by the taxpayer to the purchasers of its milk in violation of the Milk Control Law of Pennsylvania. We concluded these rebates should be applied to reduce the taxpayer's gross sales on the theory that the product was in fact sold for an agreed net price, arrived at by reducing the minimum price provided for the product by the Milk Control Law by the amount of the agreed upon rebate. We therefore did not reach the question as to whether the rebates qualified as ordinary and necessary business expenses deductible from gross income. In the *185 course of our discussion we said, beginning at page 716: "It does not follow, of course, that all allowances, discounts, and rebates made by a seller of property constitute adjustments to the selling prices. Terminology, alone, is not controlling; and each type of transaction must be analyzed with respect to its own facts and surrounding circumstances. Such examination may reveal that a particular allowance has been given for a separate consideration - as in the case of rebates made in consideration of additional purchases of specified quantity over a specified subsequent period; or as in the case of allowances made in consideration of prepayment of an account receivable, so as to be in effect a payment of interest. The test to be applied, as in the interpretation of most business transactions, is: What did the parties really intend, and for what purpose or consideration was the allowance actually made? Where, as here, the intention and purpose of the allowance was to provide a formula for adjusting a specified gross price to an agreed net price, and where the making of such adjustment was *186 not contingent upon any subsequent performance or consideration from the purchaser, then, regardless of the time or manner of the adjustment, the net selling price agreed upon must be given recognition for income tax purposes." Applying the test so provided in Pittsburgh Milk to the facts now before us, we have concluded and have found as a fact that the payments made by petitioner to its customers during the years in issue constituted rebates of purchase price made pursuant to agreements with those customers, and were intended to reduce the charge for the product sold below the specified gross price in an amount equal to the rebate. No other conclusion would be warranted by this record. Respondent argues this case is distinguishable from Pittsburgh Milk inasmuch as the result there was predicated upon a stipulation that the customer allowances were made for the purpose of avoiding the Pennsylvania Milk Control Law pursuant to agreements with those customers. Contending that petitioner denies its payments violated the Milk Control Law, and further that it has failed to establish any informal agreements with its customers calling for the payments, respondent maintains reliance upon *187 that case is misplaced. We do not agree. Our holding in Pittsburgh Milk was not based upon a finding that the particular payments were intended to circumvent the Milk Control Law, nor upon a finding that they did so violate the provisions of that law. Rather, it resulted from a recognition of the substance of what occurred; i.e., that notwithstanding the fact that the taxpayer received a gross amount upon the sale of its product, it rebated a porion thereof to the purchaser pursuant to prior agreement, the end result being the sale of the product at a specified net price. Consequently, the rebate was not received under any claim of right, but rather constituted a deposit to be returned by the seller, and therefore was not income to it. Further, there is sufficient evidence in this record to justify our finding that the payments were made pursuant to prior agreements between petitioner and its wholesale customers. We therefore see no distinction between that proceeding and the one presently before us. The lengths to which petitioner went in disguising its customer payments as advertising and other operational expenditures on its books might suggest wrong doing, but, as the Supreme *188 Court said in Commissioner v. Wilcox, 327 U.S. 404, "Moral turpitude is not a touchstone of taxability." Finally, respondent challenges the correctness of our holding in Pittsburgh Milk. We believe we were right, and now adhere to that result. Tri-State Beverage Distributors, Inc., 27 T.C. 1026 (1957). We therefore hold that the customer payments which petitioner made during each of the years in issue, in the amounts as set forth in our Findings, did not constitute income to it when received, and are properly to be used to reduce its gross sales in determining its gross profits from sales for Federal income tax purposes. Our Findings dispose of the amounts of these payments for each of the years in issue, however, a few comments with respect thereto might well be warranted. Petitioner has classified as a customer payment a loan to a customer during its fiscal year ended September 30, 1953, in the amount of $750. The record indicates this amount was subsequently repaid and taken into cash. Though the net effect of this is to take the $750 into income in the year of its recovery, we are of the opinion that the original loan cannot be classified as a customer *189 payment. Further, we note the total amounts returned by petitioner during each of the years in issue, whether as adjustments to gross receipts or as deductible expenses, were computed by adding to the amounts advanced to Advance Advertisers the amounts expended directly by petitioner. The record reveals that in at least two of the years in issue Advance Advertisers expended less than the amounts advanced it, and that in at least two other years its expenditures were in excess of the advances. Therefore, in arriving at the amounts properly to be considered as customer payments we have considered only those amounts actually expended either by Advance Advertisers or directly by the petitioner. This leaves for our consideration the payments which were made by petitioner to non-customers, exclusive of the free delivery of products to its officers, set forth in our Findings as disbursed for: Advertising
$6,862.43
Operating Expenses
5,579.06
Advertising Display
650.00
Refrigerator Supplied Customer
211.50 Petitioner has conceded the refrigerator expense item, agreeing with respondent that it represented a capital expenditure. The remaining items clearly were not customer *190 payments, and thus respondent's contention that they are not deductible business expenses because they violate the provisions of the Milk Control Law relating to rebates is beside the point. We do not understand respondent to contend that the operating expenses incurred by Advance Advertisers per se violated the public policy of the Commonwealth of Pennsylvania, but only that they did so if they constituted customer payments. However, assuming without deciding that the "business" of Advance Advertisers, i.e., the making of rebates, was directly contrary to the public policy of Pennsylvania as expressed in its Milk Control Law, we cannot say the expenses incidental thereto, which were not illegal in themselves, may not be deducted. See Commissioner v. Sullivan, 356 U.S. 27 (1958) where certain business expenses, incident to activities made illegal by State law, were held deductible. Apparently respondent's only other concern is whether or not the amounts were actually expended for the purposes claimed. We are satisfied from the record that they were. As evidence of its various transactions, petitioner introduced a schedule of cancelled checks issued by Advance Advertisers *191 on which is set forth the date of the check's issuance, its number, the payee, and the purpose for which it was issued; i.e., a customer allowance, advertising expense, or operational expense. Also introduced in evidence were cancelled checks relating to other transactions which were appended to a similar schedule setting forth the particulars of their issuance. These schedules were prepared by petitioner's chief accounting officer shortly before trial of this proceeding from an examination of the checks themselves. In making this analysis he relied upon his familiarity with the specific accounts involved, plus knowledge of some of the particular transactions. While the various transactions numbered in the thousands, and there is a possibility for error, we are of the opinion that petitioner, by virtue of the evidence presented, has at least overcome the presumptive correctness of the notice of deficiency, and thus shifted the burden of going forward to the respondent. On the other hand, we cannot say that respondent has met his burden simply by suggesting the possibility of error. Respondent submits the $650 expended in 1951 for an advertising display was not disallowed, and therefore *192 is not in issue. His argument is that this amount was deducted by petitioner as an advertising expense on its return, and that there was no disallowance of an advertising deduction in the notice of deficiency for the fiscal year ended September 30, 1952. If this be true, it applies equally to $2,100 advance to Advance Advertisers during that taxable period which was also deducted on the return as an advertising expenditure. The parties have stipulated petitioner advanced to Advance Advertisers $23,100 during its fiscal year ended September 30, 1952, of which $21,000 was returned as "Returns and Allowances" and used to reduce gross sales; the remaining $2,100 being deducted as an advertising expense. They have further stipulated that $1,908.88 in customer payments was deducted as a "Selling Expense." These items total $25,008.88, whereas the total disallowance set forth in the statement attached to the notice of deficiency was: (a) Returns and Allowances
$23,750.00
(b) Selling expense
1,908.88
$25,658.88 It would thus appear that the difference, $650, was the amount expended by petitioner on the advertising display. It would also appear that the $2,100 advance *193 to Advance Advertisers which was deducted as an advertising expense was included in the $23,750 disallowance of "Returns and Allowances." In any event, we are persuaded by the record that petitioner is entitled for its fiscal year ended September 30, 1952, to: an adjustment to gross sales for customer allowances of $22,602.47; and advertising expense deduction of $650 for the airport display; and miscellaneous expense deductions in the respective amounts of $1,406.62 and $1,337.20. The final issue is whether the cost of milk products delivered free-of-charge to its officer-stockholders, during its fiscal years ended September 30, 1956 and 1957, was deductible by petitioner as an ordinary and necessary business expense. Petitioner's primary position is that the free delivery of these products was in the nature of a fringe benefit. It further contends that it expected the recipients would provide a means whereby it could check the quality of its various products. Under either theory, it claims the estimated cost of these products was a deductible business expense. Respondent, on the other hand, argues that the value of these products constituted either a distribution of earnings *194 and profits to petitioner's stockholders, or the payment by it of personal living expenses of its officer-stockholders. We believe the record to be inconclusive insofar as petitioner's contention that its officer-stockholders performed a quality check service for it in return for the free delivery of its milk products. The only evidence bearing on this point appears in the testimony of petitioner's vice-president on direct examination, where he said: "We have allowed all our employees a discount on their milk. That has been our practice over the years. As far as the officers, that is the reason my father started in the milk business, so he could get milk cheaper for his family. I don't know - that has been the practice of people who work in the place, and certainly they can drink their own products. It gives us a chance of our own to judge the quality, know what - That has been a practice as far as I can remember. I have never before been questioned on it." Clearly this testimony is not a sufficient basis upon which to make a finding that petitioner expected its officer-shareholders to make a quality check on its products, and that in consideration therefor the products were *195 delivered to them free-of-charge. Thus, we are left with petitioner's claim that these free products were in the nature of fringe benefits. So far as this record is concerned, the only individuals receiving such products were officer-stockholders. Further, the stipulation indicates that petitioner's stock was closely held by Robert E., Howard L. and James A. Thompson who were respectively, its president, vice-president and treasurer. Therefore, our immediate concern is whether the products were received free-of-charge because of the recipient's executive position, or because of his status of stockholder. In case of the latter, respondent well may be correct in contending the value of these products constituted a distribution of earnings and profits. The record fails to disclose which of the two relationships engendered the free products. Thus, we cannot say that respondent's disallowance of these items was erroneous. Decisions will be entered under Rule 50. Footnotes
1. Purdon's Pa Stat. Ann., title 31, sec. 700j↩.
1. Of total disbursements of $3,704.47 only $1,940.36 was disallowed by respondent. ↩
2. Used to reduce Gross Sales. ↩
4. Includes $750 loan subsequently repaid and taken into cash at an undisclosed time. ↩
5. Amount disallowed in Deficiency Notice.↩
3. Erroneously set forth in Deficiency Notice as $8,582.23. ↩