MAX SOBEL WHOLESALE LIQUORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5665–76.     Filed December 15, 1977.

*Charles R. Breyer* and *Jeffry A. Bernstein*,  for the petitioner.
*Vernon R. Balmes* and *Edward B. Simpson,* for the respondent.

QUEALY, *Judge:* This proceeding involves the redetermination of deficiencies in income taxes of petitioner as follows:

| FYE Jan. 31— | Deficiency |
|---|---|
| 1973 | $72,468 |
| 1974 | 59,487 |
| 1975 | 42,410 |

As a result of concessions by the parties, the sole question for

decision is whether the petitioner is precluded from charging as a cost or deducting under section 162(c)(2)[1] the cost of liquor and wine transferred to selected customers in violation of the laws of the State of California.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Max Sobel Wholesale Liquors (hereinafter referred to as petitioner) is a California corporation with its principal place of business in San Francisco, Calif. At all times material herein, petitioner was engaged in the distribution and sale, at wholesale, of liquor, wine, and other alcoholic beverages in and around the Bay area of San Francisco. Its Federal income tax returns for the fiscal years ended January 31, 1973 to 1975, inclusive, were filed with the Internal Revenue Service, Fresno, Calif.

The petitioner's books and records were maintained on the accrual basis of accounting, and petitioner reported its income for Federal income tax purposes on that basis. In computing its costs of sales, purchases of liquor and wine were carried in inventory at petitioner's cost. Delivery of liquor and wine to its customers were made out of such inventory, thereby reflecting the cost of such deliveries as a part of the cost of sales.

The business of distributing and selling liquor at wholesale was regulated under California law. The enforcement of such laws was delegated to the Department of Alcoholic Beverage Control of the State of California (hereinafter referred to as ABC). Section 24756 of the California Business & Professions Code (West 1964), in force during the years involved in this proceeding, provided as follows:

*Price lists; filing; contents; compliance.* Every distilled spirits manufacturer, brandy manufacturer, rectifier, and wholesaler shall file and maintain with the department a price list showing the prices at which distilled spirits are sold to retailers by the licensee. Sales of distilled spirits to retailers by each distilled spirits manufacturer, brandy manufacturer, rectifier, and wholesaler shall be made in compliance with the price list of the licensee on file with the department.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

Section 24862 of the California Business & Professions Code provides for a similar procedure with respect to wine manufacturers and wholesalers.

As a wholesaler of liquor and wine, the petitioner was required to file or to post each month the selling prices for the liquor and wine to be sold by it in accordance with sections 24756 and 24862 of the California Business & Professions Code. Such price list became effective for sales made during the ensuing month. The prices posted by petitioner and its competitors, in most cases, were determined in the first instance by the producers or importers of such spirits. The producers or importers of liquor and wine supplied "suggested" monthly price lists to the petitioner in order that such prices might be posted with the ABC. If the petitioner did not conform to the suggested prices, there was a risk that the supplier would terminate petitioner's right to distribute the brands of liquor and wine which the petitioner obtained from that source.

During the period involved in this proceeding, the petitioner evolved a procedure whereby certain selected customers might purchase liquor and wine from the petitioner on a basis more favorable than the selling prices for such liquor and wine posted by the petitioner with the ABC. An agreement was entered into with such customers pursuant to which, with each purchase of liquor or wine, the customer would be entitled to a credit of a stated percent of the total purchase, which amount would be available to be used by such customer in the purchase of additional quantities of liquor or wine. In other instances, the agreement provided that with the purchase of a case of certain liquors or wines, the purchaser would be entitled to receive an additional bottle of that liquor or wine.

The petitioner maintained a "black book" setting forth the name of the customer, the purchases by such customer, and the credit to which the customer was entitled. Periodically, such credits would be availed of by the customer to purchase additional liquor or wine or the customer would be supplied with the additional bottles to which the customer became entitled under the agreement of purchase.

When the petitioner received a regular order from its customers, the order was filled and delivered by the petitioner out of inventory. As a part of petitioner's accounting and billing system, a sales invoice was prepared with respect to each sales

transaction which listed thereon the brand and quantity of the spirits sold and the sales price, along with any posted discount. The billing price for liquor and wine listed on such sales invoice conformed to the prices posted with the ABC as required by California law.

When the petitioner received an order for use of the "credit" from one of the selected customers to whom the petitioner had agreed to give such credit, a document was prepared identifying the retailer, the type of spirits, brand name, quantity, and amount. A copy of this document, referred to as a "drop tag," was transmitted to the employee in charge of maintaining the inventory records in order that he might remove the designated quantity from inventory. Another copy of the "drop tag" was sent to the warehouse in order that the goods would be released for pickup by the retailer or for delivery. The additional goods supplied to the customer were thus removed from inventory and automatically charged as a part of the cost of sales. The credits and deliveries made on account thereof were recorded in the "black book" but did not otherwise appear in the petitioner's accounting records.

The practice whereby the petitioner gave rebates, credits, or additional merchandise to selected customers, without reflecting such in the prices posted by petitioner with the ABC, was in violation of the laws of the State of California.

An "Accusation" was filed by the State of California against the petitioner alleging violations of sections 24756, 24862, 25503(b), 25503(d), 25503(e), and 25600 of the California Business & Professions Code. The dates of particular violations for which petitioner is cited in the "Accusation" are—on or about—March 28, 1972; April 24, 1972; July 13, 1972; January 5, 9, 1973; March 8, 15, 23, 1973; and April 3, 1975. Petitioner stipulated to having violated California law. As a result of such stipulation, petitioner's license to do business was suspended for 15 days.

During the fiscal year ended January 31, 1973, petitioner delivered to the selected customers at no additional charge, in satisfaction of the credits recorded in the "black book," liquor and wine from its inventory having a cost to petitioner in the amount of $121,218. During the fiscal year ended January 31, 1974, similar deliveries were made out of inventory having a cost to petitioner of $13,757. The practice was discontinued in April 1973 due to a Federal grand jury investigation.

In his notice of deficiency, respondent increased petitioner's income as reported for the years ending January 31, 1973 and 1974, in the amounts of $121,218 and $13,757, on account of the additional spirits charged to the cost of goods sold.

## OPINION

The petitioner was a wholesale liquor dealer in the San Francisco Bay area. Under California law, the business was subject to regulation by the Alcoholic Beverage Control Board. Petitioner was required to file monthly price lists with the ABC and was prohibited from selling below the posted prices. The prices at which the petitioner was supposed to sell spirits were "suggested" by its suppliers. If the petitioner posted prices different from those suggested by the suppliers, petitioner ran the risk of having its distributorship terminated by the supplier.

Notwithstanding the posted prices, wholesale liquor dealers in the San Francisco Bay area offered credits, discounts, or rebates to selected customers in order to keep their business. In the case of the petitioner, selected customers were advised that the purchase of stated quantities of designated brands of spirits would entitle the purchaser to a credit, either stated in dollars or in kind, whereby the purchaser could acquire additional spirits up to the amount credited in a secret account maintained for each of such purchasers. The practice constituted a violation of the California law regulating the pricing of alcoholic beverages and could be interpreted as a violation of Federal law prohibiting the distribution of "free goods" as an inducement to the sale of such beverages.

Sales of spirits were reflected on the books of the petitioner at invoice prices in conformity with the schedule of prices filed with the ABC. The additional spirits which the customers obtained by credits earned on such purchases were delivered out of inventory and the cost thereof was automatically reflected in the cost of sales. While respondent seeks to distinguish between the granting of a rebate payable in merchandise and a rebate payable in cash, the result is the same. In fact, the case of one of petitioner's competitors who granted cash rebates "under the table" is also before this Court.[2] The basic question is whether

---

[2]*Haas Brothers v. Commissioner,* docket No. 5219–76.

such rebates, regardless of form, come within the scope of section 162(c).

Insofar as applicable hereto, section 162(c) provides:

(c) ILLEGAL BRIBES, KICKBACKS, AND OTHER PAYMENTS.—

\*     \*     \*     \*     \*     \*     \*

(2) OTHER ILLEGAL PAYMENTS.—No deduction shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes an illegal bribe, illegal kickback, or other illegal payment shall be upon the Secretary to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud).

Section 162(c)(2) thus denies the *deduction* of certain payments, which might otherwise be deductible under section 162(a), on account of the illegality of such payments. The Court must first decide whether the agreement between petitioner and its selected customers, whereby the stated invoice price of the spirits was subject to a credit for the purchase of additional merchandise, constituted an "illegal bribe, illegal kickback, or other illegal payment" otherwise deductible under section 162(a).

The practice of illegally rebating did not originate with these San Francisco wholesale liquor dealers. This practice first came before the Tax Court in the case of rebates granted contrary to State law in the sale of milk. *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956).[3] The *Pittsburgh Milk* case was then invoked by the respondent to deny to the taxpayer, an Illinois liquor dealer, an adjustment in computing the World War II excess profit tax credit for an abnormal deduction for illegal rebates to its customers. *Tri-State Beverage Distributors, Inc. v. Commissioner*, 27 T.C. 1026 (1957).

In the *Pittsburgh Milk* case (and the cases which followed that decision), this Court distinguished *between* a discount or rebate

---

[3]See also *Atzingen-Whitehouse Dairy, Inc. v. Commissioner*, 36 T.C. 173 (1961); *Harmony Dairy Co. v. Commissioner*, 19 T.C.M. 582 (1960); *Rosedale Dairy Co. v. Commissioner*, 16 T.C.M. 1121 (1957).

to which the customers became entitled at the time of sale *and* costs incurred in the form of illegal payments, or payments to the third parties, which were not made pursuant to agreement between the buyer and the seller. Where the rebate was a part of the transaction of sale, this Court held that the deductibility of such payment was not the question. The rebate was a reduction in gross income. This principle was reaffirmed in *Atzingen-Whitehouse Dairy, Inc. v. Commissioner*, 36 T.C. 173 (1961), wherein this Court said:

RAUM, *Judge:* (1) We have concluded on the evidence that the actual prices at which petitioner sold its products were the invoice prices minus the discounts agreed upon between petitioner and its customers. Accordingly, the problem before us is not whether such discounts are deductible as "ordinary and necessary" business expenses from gross income in arriving at net income, cf. *Tank Truck Rentals v. Commissioner*, 356 U.S. 30; rather it is whether the discounts must be taken into account in determining the amount of gross income chargeable to petitioner in the first instance. Cf. *Lela Sullenger*, 11 T.C. 1076 acq. 1952–2 C.B. 3. We hold, following *Pittsburgh Milk Co.*, 26 T.C. 707, which involved a virtually identical situation, that in computing gross income the amount of petitioner's sales must be based upon its actual prices and not upon the theoretical legal minimum prices. The present case is closer to the *Pittsburgh Milk Co.* case than to *Boyle, Flagg & Seaman, Inc.*, 25 T.C. 43, relied upon by respondent.

Respondent urges that the decision in the *Pittsburgh Milk Co.* case be reconsidered. He made a similar contention in two other cases, in which the holding in the *Pittsburgh Milk Co.* case was reaffirmed and followed in memorandum opinions by this Court. Moreover, the theory of the *Pittsburgh Milk Co.* case has been applied, at the respondent's urging, in *Tri-State Beverage Distributors, Inc.*, 27 T.C. 1026, 1030–1031. We are not disposed to reopen the question. [Fn. ref. omitted]

Respondent argues that the *Pittsburgh Milk* case was overruled by *Tank Truck Rentals v. Commissioner*, 356 U.S. 30 (1958), and *Commissioner v. Tellier*, 383 U.S. 687 (1966). The *Pittsburgh Milk* case was decided on June 27, 1956. The respondent announced his nonacquiescence in that case in 1959–1 C.B. 6. Thereafter, respondent withdrew his nonacquiescence and announced acquiescence in the *Pittsburgh Milk* case in 1962–2 C.B. 5, which was after the decision of the Supreme Court in the *Tank Truck Rentals*[4] case. In anticipation of this litigation, respondent withdrew such acquiescence and reverted to his original position by nonacquiescing in the *Pittsburgh Milk* case

---

[4]Respondent had unsuccessfully argued that the *Tank Truck Rentals* case overruled the *Pittsburgh Milk* case in *Harmony Dairy Co. v. Commissioner, supra*, which was decided on May 31, 1960.

on August 16, 1976, or some 10 years after the decision of the Supreme Court in the *Tellier* case. (1976–33 I.R.B. 6). The *Pittsburgh Milk* case was relied on by this Court in *Schiffman v. Commissioner*, 47 T.C. 537 (1967), and distinguished by the U.S. Court of Appeals for the Second Circuit in *Ertegun v. Commissioner*, 531 F.2d 1156 (2d Cir. 1976). Respondent's claim that the *Pittsburgh Milk* case has been overruled, at this late date, is wholly lacking in merit.

In his brief, respondent also contends that in accounting for the additional spirits supplied by petitioner to its customers pursuant to the illegal rebates, the cost of such spirits was treated as a part of the cost of sales by the petitioner and is, therefore, distinguishable from the rebates involved in the *Pittsburgh Milk* line of cases. Those cases did not, however, look to the manner in which the taxpayer entered the transaction in its books in order to conceal the illegal rebate. Bookkeeping entries were ignored. In the *Pittsburgh Milk* case, the illegal rebates were charged to "advertising" and deducted as such. In the *Rosedale Dairy* case, the illegal rebates were deducted as "freight and hauling." In the *Harmony Dairy* case, the payments were disguised as "advertising or other operational expenditures." In the *Atzingen-Whitehouse Dairy* case, the illegal rebates were charged to "selling expense-sales promotion."

Finally, there is the question whether subsequent amendment of section 162(c) might be construed as having overruled the *Pittsburgh Milk* line of cases. Section 162(c)(2) in its present form was added to the Internal Revenue Code by section 310 of the Revenue Act of 1971. The change in law was intended merely to define the degree of criminality or culpability which would vitiate the deduction. Section 162(c)(3) was added to the Code at the same time. In both cases, the statute reads that "No deduction shall be allowed under subsection (a)" for the payments described in section 162(c)(2) and (3). Since the *Pittsburgh Milk* line of cases did not deal with the deductibility of the payment, but rather its exclusion from gross income, it would be difficult to infer that Congress intended to overrule prior law.

We must assume that Congress was aware of the decision of this Court in the *Pittsburgh Milk* case. At the time that the legislation was enacted, the respondent had acquiesced in that

decision. If Congress had intended to overrule the *Pittsburgh Milk* case, it is only reasonable to expect that the amendment would have been more specific in so doing or that the congressional intent would find expression in the report of the Finance Committee accompanying the bill. No mention of any such intent is made in the report of the Finance Committee accompanying the bill. S. Rept. 92–437, 92d Cong., 1st Sess. 72–73.

Notwithstanding, respondent has changed his position in an effort to extend the statute to exclude bribes, kickbacks, and other illegal payments which might otherwise be chargeable to the cost of goods sold. See Rev. Rul. 77–244, 1977–29 I.R.B. 8. Section 1.61–3(a), Income Tax Regs., provides that amounts which are a type for which a deduction would be disallowed under section 162(c),(f), or (g) in the case of a business expense may not be deducted from gross receipts in order to arrive at gross income. Similarly, section 1.471–3(d), Income Tax Regs., provides that "cost shall not include an amount which is of a type for which a deduction would be disallowed under section 162(c),(f) or (g) and the regulations thereunder in the case of a business expense."

In our opinion, assuming the validity of the regulations, the rule stated would not apply in the case before the Court. Depending upon the nature of the business, the cost of goods sold may include material, labor, and overhead. There may be certain expenses of a dual character which may be chargeable either to overhead in the cost of goods sold or deducted as administrative or sales expense. In any event, the Court would limit the regulations as to preclude the deductibility of an illegal payment charged to overhead in the cost of sales *of the type* which might otherwise be deductible as administrative or sales expenses. A typical example would be a bribe given for the purpose of obtaining goods or for the purpose of expediting its delivery to the taxpayer for manufacture and resale.

In the case before the Court, we are not confronted with that type of expense. In effect, the petitioner's agreement with its selected customers provided for the sale of spirits priced at $102.50 for $100 or for the sale of 13 bottles of wine for the price of 12 bottles. The additional quantity supplied came out of inventory and was automatically reflected in the cost of sales. Such costs are not an overhead or indirect expense charged to

the cost of sales and were not "of a type" for which a deduction would be disallowed under section 162(c)(3).

In view of the foregoing, it is the opinion of the Court that the *Pittsburgh Milk* line of cases has not been overruled either by subsequent decisions of this Court or any other court, and that no congressional intent to overrule that line of cases can be inferred from its legislative enactment of section 162(c)(2). The only logical inference would seem to be to the contrary. Accordingly, the respondent's position with respect to this issue must be rejected.

Petitioner argues that respondent has not met the burden of proof with respect to the enforcement of the California law, as required by section 162(c)(2). In substance, petitioner's argument is that all the Bay area wholesalers were making price concessions, and until the Federal grand jury investigation, there were no prosecutions. An appropriate response would be that if the law was not being enforced, why did petitioner conceal its illegal pricing practices. However, in light of our opinion, it is not necessary to decide whether the respondent has met the burden of proof required of him under section 162(c)(2). That section simply is not applicable to the facts in this case.

Petitioner also reserved the right to claim and to present proof of reasonable attorney fees. It is the position of this Court that Pub. L. 94–559, 90 Stat. 2641, amending 42 U.S.C. sec. 1988, does not confer jurisdiction on this Court to award costs to petitioner. *Key Buick Co. v. Commissioner*, 68 T.C. 178 (1977). For that reason, petitioner's request to be permitted to adduce additional evidence to document the amount of costs incurred on account of attorney fees is denied.

*Decision will be entered under Rule 155.*

Reviewed by the Court

DRENNEN, *J.*, dissenting: I do not disagree with the principles expressed in the majority opinion; nevertheless, I would reach the opposite conclusion in this case for a reason not discussed in the majority opinion. Stated briefly, I would reduce the cost of goods sold by the cost to the taxpayer of the "credit" merchandise which I conclude was not sold by the taxpayer.

A "sale" was defined by the Supreme Court in *Commissioner v. Brown*, 380 U.S. 563 (1965), to be "a transfer of property for a fixed monetary price or its equivalent." As I understand the facts in this case, Sobel sold wine and liquor to its preferred customers at list prices and entered the full amount of the list prices in sales. It then noted a credit in favor of the preferred customers in its "black book." Subsequently, according to the majority opinion, the customers were delivered additional merchandise "at no additional charge, in satisfaction of the credits recorded in the 'black book' " from its inventory and the cost of such merchandise to Sobel was charged to cost of goods sold.[1] Presumably no further sale was recorded in Sobel's books. In my opinion this subsequent transaction did not constitute a sale of the credit merchandise under the above definition of "sale."

There is no specific provision in the Code that allows a reduction in, or deduction from, income for cost of goods sold. The Commissioner of Internal Revenue and the courts have simply recognized that no more than gross income can be subjected to income tax and that the cost of goods sold must be deducted from gross receipts in order to arrive at gross income, the starting point for an income tax. *Sullenger v. Commissioner*, 11 T.C. 1076 (1948); *Hofferbert v. Anderson Oldsmobile*, 197 F.2d 504 (4th Cir. 1952).[2] But surely the cost of merchandise that is not sold but is in fact given away, under whatever scheme may be devised, should not enter into the computation of profit or gross income from the disposition of merchandise in a transaction that produces no gross receipts. Illustrative of this principle are the cases that have held that a merchant who withdraws goods from his stock in trade for his own use may not include the cost of those goods in cost of goods sold. See *Appeal of P. P. Sweeten v. Commissioner*, 3 B.T.A. 37 (1925); *Demor, Inc. v. Commissioner*, T.C. Memo. 1968–279 (1968). See also *City Ice Delivery Co. v. United States*, 176 F.2d 347 (4th Cir. 1949), wherein it was held that an ice dealer could not include in cost of goods sold payments made to its supplier not to make ice in order

---

[1] It is not clear whether the charge to cost of goods sold was made at the time of the sale or at the time the credit merchandise was delivered. This would make a difference only if the two events occurred in different taxable years.

[2] These and similar cases denied the exclusion from cost of goods sold of payments for goods in excess of amounts allowed by law. Here, of course, we are not concerned with illegal payments made by Sobel. The cases do, however, establish the principle for which they are cited.

to keep the retail price of ice up because it had not made an actual sale. It may be that the cost of the "credit" merchandise is a cost of doing business to petitioner but it must prove its deductibility in some way other than including it in cost of goods sold.

I doubt that the majority would allow this credit as a deduction under section 162(c)(2). Since petitioner included in sales the entire list price of the merchandise actually sold I do not believe the principle espoused in *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956), should be involved.

FAY, DAWSON, and WILES, *JJ.*, agree with this dissenting opinion.