RUPERT A. EATON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Eaton v. Commissioner
Docket No. 1476-78.
United States Tax Court
T.C. Memo 1979-320; 1979 Tax Ct. Memo LEXIS 201; 38 T.C.M. (CCH) 1233; T.C.M. (RIA) 79320; August 20, 1979, Filed *201 Held: Petitioner's payment of $6,669.95 to Joseph C. Essa constituted $2,169.95 as boot in an exchange of cars with Essa, and $4,500 as a rebate to the purchaser of the inventory of petitioner's business. Accordingly, petitioner is entitled to reduce the gain on the sale of his business and inventory by $4,500. Norman B. Smith, for the petitioner. Mathew E. Bates, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency in petitioner's income taxes for the taxable year 1973 in the amount of $6,380.37. Due to concessions, the only issue remaining for our consideration is whether petitioner is entitled to reduce the gain from the sale of his inventory by a $4,500 payment made to an agent for the purchaser. FINDINGS OF FACT Some of the facts *202 have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto are incorporated herein by this reference. Petitioner, Rupert A. Eaton, filed his Federal income tax return for the taxable year 1973 with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner's residence at the time he filed his petition herein was in Greensboro, North Carolina.
Petitioner was the sole owner of all the outstanding corporate stock of the Sedgefield Pallet Company, Inc. (hereafter Sedgefield). In 1973, J. Kenneth Lee (hereafter Lee) acting as an agent for an undisclosed principal, offered to purchase Sedgefield. To negotiate the purchase, Lee contacted Joseph C. Essa (hereafter Essa), a partner of Lee's in the Cumberland Development Corporation. Lee and Essa agreed that Essa would manage Sedgefield once it was acquired, and that Essa would purchase from Lee at least a one-half interest in Sedgefield as soon as funds became available to Essa from the Cumberland Development Corporation. Essa contacted petitioner and agreed with him to structure the sale in two parts: a sale of the stock and a separate sale of the inventory.The inventory *203 had a fair market value of $2,169.95. Essa, however, suggested that $4,500 be added to the inventory value. He explained to petitioner that this amount would be covered by "Government money" and asked whether petitioner wanted some of this money. Petitioner declined the offer, but agreed to go along with the inflated value of the inventory. Essa was to purchase the inventory from Lee once Lee had completed his transaction with petitioner. Essa did not, however, have sufficient funds to make this purchase. He agreed with petitioner, therefore, to an exchange of cars, plus "boot" equal to the actual value of the inventory ($2,169.95) to be paid to Essa by petitioner in order for Essa to raise the needed money. Essa owned a 1972 Cadillac Eldorado convertible subject to a $4,903.88 lien which he was to trade for petitioner's 1970 Cadillac Coupe de Ville. Essa and petitioner met with Lee and reported to him the inflated value of the inventory. Lee asked Essa if the value were correct, and Essa assured him that it was. Lee subsequently made a partial payment for the stock in the corporation on March 9, 1973, and paid $6,669.95 for the inventory (the $2,169.95 actual value plus *204 $4,500 inflated value). Lee did not receive any Government financing for the purchase. Petitioner then met with Essa on March 13, 1973, for the purpose of exchanging the cars. Petitioner wrote and cashed a check for $6,669.95 at the Wachovia Bank, which he then gave to Essa when they exchanged cars. Essa then paid off in full the $4,903.88 lien on his 1972 car; petitioner and Essa exchanged titles to their cars, and Essa refinanced his newly acquired 1970 car at the Northwestern Bank for $2,147.16. Essa became manager of Sedgefield, and petitioner stayed on at Sedgefield for one or two months to teach Essa the business. In December 1975 Essa acquired half of the stock in Sedgefield from Lee. Lee transferred the remaining shares to the corporation as Treasury stock, making Essa the sole shareholder.
Petitioner reported a gain of $15,446 on the transaction. Respondent determined that petitioner's gain from the sale of the Sedgefield stock was $34,034.52. Due to concessions by petitioner, only the $4,500 inflated value of this gain is relevant to the present case. OPINION The question presented for our consideration is whether petitioner's gain on the sale of Sedgefield *205 Pallet Company, Inc. should be reduced by the $4,500 paid to Essa as an alleged rebate of the purchase price. [1]
In a sale, the seller is taxable only on the amount of gain actually realized from the transaction. Amounts refunded by a seller are not included in calculations of gross income for purposes of determining the taxable gain.[2] If petitioner properly refunded a portion of the purchase price paid to him on the sale of Sedgefield Pallet Company, his gain must be reduced by the amount of the refund.Petitioner, of course, has the burden of proving that the payment to Essa was a refund to reduce his gain from the sale of his business. Welch v. Helvering,290 U.S. 111 (1933); *206 Rule 142, Tax Court Rules of Practice and Procedure.
Respondent contends that the $6,669.95 received from petitioner was "boot" in connection with the exchange of cars. Respondent's witness, Essa, claimed that his 1972 car was worth $8,500, $200 more than he paid for the car in January 1972, when it was new. Essa stated that a cash payment of $6,000 from petitioner was totally unrelated to the inventory sale. [3]
*207 We find that Essa's testimony is not credible. Although resolution of the present case has been made difficult by the fact that the testimony is confusing and conflicting and by the fact that neither respondent nor petitioner introduced any evidence to establish the values of their automobiles, we find that petitioner's position, that the value of the inventory was intended as "boot", is more credible and realistic than Essa's position that his 1972 Cadillac had appreciated $200 in value 14 months after he originally bought it. The $4,500 portion of the $6,669.95 payment to Essa, therefore, was intended as a refund of the overstated value of the inventory. In our findings of fact, we found that prior to the actual sale of Sedgefield, petitioner agreed with Essa to refund the $4,500 inflated value of the inventory to Essa. At no time did petitioner intend to retain that payment. Petitioner was merely an accommodating middleman, a willing conduit through which the funds flowed to Essa from Lee. Petitioner did not benefit from any portion of this payment; he almost immediately passed it on to Essa. Respondent argues on brief that the $4,500 payment made to Essa cannot qualify, *208 in any event, as a rebate because the payment was not made to the buyer, Lee. Respondent states that he "cannot say exactly what petitioner's $4,500 payment to Joseph C. Essa represents," but, as the payment was made to a third party, it cannot go to reduce the petitioner's gain. While we can sympathize with respondent's confusion in this case, we find that the payment to Essa was not as unrelated to the purchaser as respondent would have us believe. Various factors demonstrating the close contacts between Lee and Essa indicate that the payment to Essa should be considered a rebate of the purchase price. We note that Lee, the purchaser, and Essa were partners in a separate corporation, the Cumberland Development Corp. Before the purchase of Sedgefild, Lee and Essa agreed that Essa would, as soon as funds became available to him from their partnership, acquire at least 50 percent of the ownership of Sedgefield and, in the purchase offer, Lee signed the statement as an "agent." We can assume, in light of the earlier agreement, only that Lee signed the purchase offer as agent for Essa. These factors indicate that Essa was the actual intended buyer of the Sedgefield company and *209 Lee was his agent in acquiring the business. He in fact did acquire the company from Lee two years later in 1975. Although we have found that Lee was Essa's agent in acquiring Sedgefield, other factors indicate that Essa functioned as an agent for Lee for purposes of negotiating the purchase. Lee asked Essa to arrange the purchase of Sedgefield from petitioner.Lee stated that in the negotiations, Essa was supposed to be representing him. It also was agreed that Essa was to become the manager of Sedgefield as soon as it was acquired by Lee. Any payments made to Essa should be considered as also received by Lee. We note in this regard that Lee testified that he had no knowledge of the inflated inventory figure, or of the subsequent payment to Essa. Regardless of this, we believe the payment to Essa qualifies as a rebate on the sale of inventory. Essa was to purchase the inventory from Lee immediately upon its purchase by Lee from the petitioner. Whether Lee knew of the inflated value of the inventory, therefore, is of no consequence. It is most unlikely that Lee would have sold the inventory to Essa for less than the amount he just paid for it. It is irrelevant, therefore, *210 whether Lee knew of the inflated value and received the $4,500 payment as a refund, plus the $2,169.95 as actual payment for the inventory, or whether Lee had no knowledge of these dealings and charged Essa the full $6,669.95 paid by him for the inventory. In either case, the purchaser, Essa, paid only the actual value of $2,169.95. Petitioner's additional payment of $4,500 to Essa qualifies, in either case, as a rebate to the purchaser. [4]
Decision will be entered under Rule 155.
Footnotes
1. Respondent notes that petitioner did not mention the refund of $4,500 in his protest letter or when petitioner was audited in 1975 on his 1973 income tax return. The payment to Essa did not come to light until 1977 in a meeting between an Internal Revenue Service conference staffer and petitioner's attorney which concerned the withdrawal by petitioner of $11,915.20 from Sedgefield. We do not find that this omission in 1975 materially affects the credibility of petitioner's statements regarding the intent of the payment.↩
2. Such amounts are reflected as an adjustment to gross receipts to arrive at gross income in a manner similar to cost of goods sold. See Section 1.61-3(a), Income Tax Regs… For example, an adjustment to gross receipts for returns and allowances is made before an adjustment for cost of goods sold on the corporate income tax return, Form 1120, line 1, and is essentially the same as where goods are sold at a trade discount. See Max Sobel Wholesale Liquors v. Commissioner,69 T.C. 477 (1977); Pittsburgh Milk Co. v. Commissioner,26 T.C. 707↩ (1956).
3. Essa stated repeatedly that petitioner had paid him only $6,000 in their exchange of cars, rather than the $6,669.95 reflected on petitioner's cancelled check. We find that Essa's assertions are in error. Petitioner's testimony, the cancelled check and the cross examination of Essa by petitioner's counsel establish that Essa received $6,669.95 from petitioner.↩
4. We note that even if the $4,500 payment received by petitioner is found to be includible in the gross receipts received on the sale from the purchaser's agent (Lee), petitioner would have been able to add this amount to his basis in Sedgefield as a cost of expediting the sale, thereby making his taxable gain equal to what it would be if the payment is considered a rebate.↩