*Decision will be entered under Rule 155.*

HAAS BROTHERS, INC., AND D & D WHOLESALE LIQUORS, INC., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5219–76.     Filed March 26, 1980.

*Luther J. Avery* and *Boyd A. Blackburn, Jr.,* for the petitioners.
*Vernon R. Balmes,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income tax in the amounts of $27,657, $32,464, and $10,502 for the calendar years 1972, 1973, and 1974, respectively.

All other issues having been settled by agreement of the

---

parties, the only issue remaining for our decision is whether cash payments made by petitioner to certain customers are to be treated as adjustments to the sales price of merchandise or as deductions from gross income to arrive at taxable income.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, along with attached exhibits, are incorporated herein by this reference.

Petitioner Haas Brothers, Inc. (hereafter Haas), is a California corporation with its principal office in San Francisco, Calif. During the years 1972, 1973, and 1974, Ernest R. Lilienthal (hereafter Lilienthal) was president of Haas and B. Sumner Burrows (hereafter Burrows) was its executive vice president. Petitioner D & D Wholesale Liquors, Inc. (hereafter D & D Liquors), is a California corporation with its principal office in San Francisco, Calif., and is a wholly owned subsidiary of Haas.

During 1972, 1973, and 1974, and for decades prior thereto, Haas was engaged in the business of selling liquor at wholesale to retail dealers in the San Francisco Bay area of California.

The individual corporate income tax return of Haas for the year 1972 and the consolidated corporate income tax returns of Haas and D & D Liquors for the years 1973 and 1974 were filed with the Internal Revenue Service, Fresno, Calif.[1] During these years, Haas reported its income on the accrual basis.

As a wholesaler of liquor, Haas was required, in accordance with section 24756 of the California Business & Professions Code—the so-called Price Posting Laws—to file and maintain with the California Department of Alcoholic Beverage Control (hereafter A.B.C.) a price list. Section 24756, as in effect during the years in issue, provided as follows:

Every distilled spirits manufacturer, brandy manufacturer, rectifier, and wholesaler shall file and maintain with the department a price list showing the prices at which distilled spirits are sold to retailers by the licensee. Domestic brandy shall not be assorted with other distilled spirits for quantity discounts, except that imported brandy, upon which duty is paid, may be assorted for quantity discounts only with imported distilled spirits upon which duty is paid. Sales of distilled spirits to retailers by each distilled spirits manufacturer,

---

[1] D & D Liquors is a party to this case solely as a result of having filed a consolidated return with Haas. All references to petitioner are solely to Haas.

brandy manufacturer, rectifier, and wholesaler shall be made in compliance with the price list of the licensee on file with the department.

The prices filed by Haas with the A.B.C. included discounts off the list prices per case of liquor goods (hereafter list discounts). The list discounts were based on quantity, type, and mix of liquor goods sold to a retailer.

Under the Price Posting Laws, a wholesaler was required to file with the A.B.C., on or before the 15th of each month, a list price (including the list discounts) at which liquor goods would be sold by it in the succeeding month. That list price could not be changed by a wholesaler after the 15th unless a competitor had filed a lower price for the same month. In such event, upon discovery of such a lower price list, a wholesaler could refile a price list at the lower price. All price lists were a matter of public record.

In 1972 and 1973, Haas sold liquor to certain retailers under a cash discount arrangement, the result of which was that sales were effectively made below the list price filed by Haas under the Price Posting Laws. The discounts were determined based upon either a flat dollar amount per case or a percentage of sales, depending upon the period of the year and, in some instances, the customers. The discounts were made only in cash. This practice, whereby petitioner paid cash discounts to selected customers, without posting with the A.B.C. the net sales price at which the goods were sold to those customers, constituted a violation of the laws of the State of California.

The amount of the discount to be given to a customer was negotiated and agreed upon between Haas and the customer prior to the sale of goods. Thus, the purchase price for goods subject to a discount arrangement was the list price, less the list discount, less the additional discount agreed upon. The agreement, when made, was to give a discount to the account of the customer, and the cash payment was not intended to be the property of the individual employee of the customer who received the payment on the customer's behalf.

At the beginning of each month, Burrows determined the total dollar amount of discounts Haas had to give to remain competitive, and salesmen were informed of the allocated amounts which they might give to their customers. When a discount sale was made, the salesman noted the discount on a tissue copy of the sales invoice (the invoice set forth the price

from the price list on file with the A.B.C.) and the invoiced discounts would be tabulated at the end of the month in which the sale was made or at the beginning of the following month. The total would then be forwarded to the various head sales managers and verified by them, in most instances, by reviewing the tissue invoice copies with the discount amounts noted thereon. Lilienthal would thereafter receive a request from the head sales managers for funds to pay the discounts. After his further verification of the discount amount, Lilienthal would deliver cash to the head sales managers for distribution to salesmen who would make the payments, or, in certain cases, Lilienthal would make the payments himself.

Funds used to pay these discounts were obtained by Lilienthal through funds generated from Haas' Green Coffee Division, which purchased coffee at wholesale in Central and South America. Haas would forward checks to a German bank which in turn credited them to the account of one of Haas' suppliers of green coffee, Ceca, Ltda., San Jose, Costa Rica, for shipments of coffee which had not in fact been made. Ceca, Ltda., would in turn forward a separate check in like amount to Levi-Strauss Realty, a California corporation, which would cash the check and hold the proceeds for Haas' account. These funds were then periodically disbursed by Levi-Strauss Realty in cash to Lilienthal, or in some cases, to Burrows, upon request. Lilienthal would keep these funds received from Levi-Strauss Realty in Haas' safe on the Haas premises and would make withdrawals therefrom to pay cash discounts either directly to customers or to various salesmen for payments to customers.

For both 1972 and 1973 those amounts which had been treated on the books of Haas as purchases of green coffee were included in its corporation income tax returns as a part of cost of goods sold. Haas did not record or include in its gross receipts for those years the receipt of the funds from Levi-Strauss Realty. Thus, the amounts of these cash discounts given by Haas for each of 1972 and 1973 were effectively treated as deductions from gross sales in arriving at gross profits for those years.

Respondent determined that the payments which petitioners made to customers violated generally enforced State laws dealing with minimum pricing and thus fell within the proscrip-

tion of section 162(c)(2) (relating to illegal bribes, kickbacks, and other payments).[2] Accordingly, respondent determined that the cash payments did not constitute deductible business expenses.

## OPINION

Pursuant to oral agreements with its customers entered into prior to the sale of liquor goods, Haas agreed to pay and did pay to its customers a cash discount off the list price of goods purchased by them. The issue before us in whether the cash payments made by Haas to its customers constituted adjustments to the sales price of the goods sold or constituted deductions which are disallowed under section 162(c)(2).

Petitioner makes two arguments with respect to the payments in question. First, it argues that to the extent it had agreements to pay certain amounts to purchasers as a result of their purchases, those amounts are not includable in gross income under section 61 whether or not such payments were illegal. The crux of this argument is that these payments are adjustments to the sales price of the goods sold and their deductibility is not governed by section 162(a) and, therefore, subject to disallowance under section 162(c)(2).[3]

In support of this position, petitioner relies on *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956), and its progeny, which distinguish between (a) discounts and rebates to which custom-

---

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the taxable years in issue.

[3] See sec. 1.61–3(a), Income Tax Regs. That section provides that amounts which are a type for which a deduction would be disallowed under sec. 162(c) may not be deducted from gross receipts in order to arrive at gross income. Petitioner's contention, as we understand it, is that the situation here results in a reduction in sales price as an adjustment to gross receipts made prior to the adjustment for cost of goods sold to arrive at gross income. That is, the discount should not be viewed as a cost of goods sold or similar expense. For example, if a business purchases an item for $10 and sells it for $20, it has gross receipts of $20 and an adjustment thereto of $10, thereby yielding gross income of $10. If the businessman gave a cash discount to the purchaser of $1, arguably the business has cost of goods sold of $10, gross receipts of $20, and gross income of $10, with a deduction of $1 for the discount. Petitioner apparently contends that the $1 discount is a reduction in sales price; thus, the businessman would have gross receipts of $20, and adjustment to the price of $1, cost of goods sold of $10, and gross income of $9. We believe petitioner is correct. An adjustment to gross receipts for returns and allowances is made before an adjustment for cost of goods sold on the corporate income tax return, Form 1120, line 1, and is essentially the same as where goods are sold at a trade discount. *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956). In *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977), on appeal (9th Cir., June 14, 1978), we held that, assuming the validity of sec. 1.61–3(a), Income Tax Regs., that section would be limited to denying an adjustment to gross income of an illegal payment charged to overhead in the cost of sales *of the type* which might otherwise be deductible as administrative or sales expenses. The resales here are not an overhead or indirect expense charged to the cost of sales or "of a type" for which a deduction would be disallowed under sec. 162(c)(3) but rather are similar to an adjustment for returns and allowances.

ers become entitled at the time of sale and (b) costs incurred in the form of illegal payments, or payments to third parties, which are not made pursuant to agreement between the buyer and the seller. *Pittsburgh Milk* held that where the rebate was a part of the transaction of sale, the rebate constituted a reduction in gross income. *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477, 482, 483 (1977), on appeal (9th Cir., June 14, 1978).

Petitioner's second argument is that even if the payments are deductions governed by section 162, respondent has not met his burden to prove, by clear and convincing evidence, that the payments were illegal and that the law was generally enforced.[4]

Respondent contends that the full (posted) sales price shown on the invoices is includable in income under the claim of right doctrine, and the deductibility of the payments made by petitioner are governed by section 162. Section 162(a) generally allows a deduction for ordinary and necessary business expenses. Section 162(c)(2) provides that no deduction shall be allowed under section 162(a) for any payment made to any person if the payment constitutes an illegal bribe, kickback, or other illegal payment under any generally enforced law of a State, which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. Respondent argues that the *Pittsburgh Milk* line of cases was overruled by *Tank Truck Rentals v. Commissioner*, 356 U.S. 30 (1958), and *Commissioner v. Tellier*, 383 U.S. 687 (1966).

Subsequent to the filing of briefs in this case, we decided a case involving precisely the same violations of the California Business & Professions Code as are involved here, *Max Sobel Wholesale Liquors v. Commissioner, supra*. In a supplemental brief filed by petitioner, it argues that *Max Sobel* is not distinguishable from the case at bar. We agree. In *Max Sobel* we addressed the same argument raised by respondent here, that the *Pittsburgh Milk* line of cases had been overruled. After reviewing the *Tank Truck Rentals* and *Tellier* cases and finding that we had continued to apply the doctrine of the *Pittsburgh Milk* decision after those Supreme Court cases were decided (see *Atzingen-Whitehouse Dairy, Inc. v. Commissioner*, 36 T.C. 173

---

[4]Respondent agrees that he has the burden of proof as to whether the payments constitute illegal payments under State law but disagrees that he must prove that the State law is generally enforced. Because we find for petitioner on other grounds, we need not resolve this legal question, or the factual question of whether the payments were illegal or the law generally enforced.

(1961)), we held that "Respondent's claim that the *Pittsburgh Milk* case had been overruled, at this late date, is wholly lacking in merit." *Max Sobel Wholesale Liquors v. Commissioner, supra* at 483, 484. We went on to hold that the credits given by the taxpayer in *Max Sobel* to selected customers constituted reductions in gross income as opposed to deductions governed by section 162(c)(2).

*Max Sobel* involved credits in the form of merchandise; the instant case involves cash discounts. However, we specifically noted in *Max Sobel* that "While respondent seeks to distinguish between the granting of a rebate payable in merchandise and a rebate payable in cash, the result is the same." *Max Sobel Wholesale Liquors v. Commissioner, supra* at 481. Therefore, having determined that the fact pattern now before us falls within that of *Max Sobel*, and since *Max Sobel* reaffirmed the vitality of the *Pittsburgh Milk* line of cases, we must reject respondent's argument and follow our holding in *Max Sobel*. Thus, we conclude that the cash discounts given by petitioner to its customers based upon their purchases constitute reductions in gross income and not deductions governed by section 162(c)(2).

*Decision will be entered under Rule 155.*