C. F. MALANKA AND SONS, INC., ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent C. F. Malanka & Sons, Inc. v. CommissionerDocket Nos. 6847-73, 6848-73, 6849-73, 6850-73, 6851-73, 6853-73, 1731-76, 1732-76, 1733-76.United States Tax CourtT.C. Memo 1979-187; 1979 Tax Ct. Memo LEXIS 338; 38 T.C.M. (CCH) 778; T.C.M. (RIA) 79187; May 14, 1979, Filed *338 Petitioners C. F. Malanka and Sons, Inc., C. Salvatore & Sons, Inc., the Catt Corp., and Mal Bros., a partnership of the Malanga brothers, petitioners, formed a Joint Venture in 1965 to perform a construction contract that had been awarded to Salvatore to construct a sewer for the City of Newark, N.J. The Joint Venture brought the pipe for the project from companies controlled by Mario Gallo. Gallo suggested that, for reasons of his own, he bill the Joint Venture for the pipe at a discount price with the understanding that the discount would be returned to Gallo as he directed. Subsequently Gallo sent the Joint Venture Fictitious invoices from Kantor Supply Co., a fictitious company, and directed the Joint Venture to pay the invoices with checks drawn to Kantor Supply. The proceeds of these checks ended up in the hands of Mayor Addonizio and various members of the city council of Newark, and others, as part of a conspiracy to collect 10 percent on all contruction contracts awarded by the City of Newark. Held:1. The Joint Venture checks to Kantor Supply Co. were illegal kickbacks to public officials not deductible by the Joint Venture. The Joint Venturers were aware of the purpose *339 for the checks and underreported their distributive shares of the Joint Venture income on their own tax returns due to fraud with intent to evade tax. 2. A $50,000 check of Mal Bros. drawn to Kantor Supply in 1967 and given to Gallo in exchange for a $50,000 check from a Gallo company was not a bribe or kickback and was not given with intent to evade tax. 3. A $13,977.67 check of Malanka, Inc., drawn to Kantor Supply in fiscal 1966 and given to Gallo ostensibly in payment of a fictitious invoice of Kantor Supply was a kickback and was due to fraud with intent to evade tax. 4. Checks totaling $608,284.26 received by Mal Bros. in 1968 from New Jersey Turnpike Authority, New York Port Authority, and others, for work performed were not reported as income in 1968 but were cashed at a bank and used to purchase bearer bonds which were delivered to the Malangas. Despite their inclusion in income for 1969, the failure to include them in income in 1968 was due to fraud with intent to evade tax. 5. Mal Bros.' erroneous inclusion in cost of good sold for 1969 of $1,176,848.71 in estimated but unbilled amounts due subcontractors as of Dec. 31, 1969, was not due to fraud with intent to evade *340 tax. John J. O'Toole and Edwin Fradkin, for the petitioners. Gerald O'Toole and Patrick Whelan, for the respondent. DRENNENMEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent determined the following income tax deficiencies and additions to tax: DocketAddition to tax No.PetitionerYearDeficiency2*341 under sec. 6653(b) 6847-73C. F. Malanka and1-31-66 $ 3,354.64Sons, Inc.1-31-6825,558.756848-73Louis Malanga and19652,369.94Mildred Malanga19665,482.301967$119,338.0159,699.011968177,047.3388,523.671969151,984.2875,992.146849-73C. Salvatore &4-30-6868,773.8034,386.90Sons, Inc.6850-73Estate of Alfred L.19652,180.20Malanga, deceased,19665,257.41Edwin Shmerler,1967119,061.0559,530.53Isidore Rosenblum1968178,745.8389,372.92and Grace Paterno,1969151,984.2875,992.14Executors, andNancy Malanga6851-73The Catt Corpora-9-30-6781,221.50$40,610.75tion6853-73George Malanga1967119,227.3559,613.681968176,86 96.6388,448.321969151,984.2975,992.151731-76Louis Managa and19657,178.073,589.04Mildred Mananga196612,629.946,314.971732-76Estate of Alfred19656,983.273,491.64L. Malanga,196612,438.416,219.21deceased, EdwinShmerler, IsidoreRosenblum and GracePaterno, Executors,and Nancy Malanga1733-76George Malanga19657,113.103,556.55and Estate of196612,550.656,275.33Anna Malanga,deceasedExcept for docket No. 6847-73, the years 1965 and 1966 are no longer in dispute. Prior to trial docket Nos. 6848-73 and 6850-73 were dismissed for lack of jurisdiction insofar as they related to 1965 and 1966. In addition, the parties have stipulated that the Court may enter a decision of no deficiency in docket Nos. 1731-76, 1732-76, and 1733-76. Many other issues have been disposed of by stipulation of facts, stipulation of settlement, on record at trial, and on brief. Remaining for our decision are these questions: 1. Was joint venture income of the Southside Interceptor Sewer System Project (and therefore taxable income of its participants Mal Bros. Contracting Co., C. F. Malanka & Sons, Inc., C. Salvatore & Sons, Inc., and the Catt Corporation) understated by reason of four checks drawn to Kantor Supply Co., a fictitious entity? 2. Was partnership income of Mal Bros. Contracting Co. (and therefore taxable income of its partners, Louis Malanga, Alfred Malanga, and George Malanga) understated for 1967 by reason of checks drawn to Kantor Supply *342 Co.? 3. Was corporate income of C. F. Malanka & Sons, Inc., understated for the fiscal year ended January 31, 1966, by reason of a check drawn to Kantor Supply Co.? 4. Was partnership income of Mal Bros. Contracting Co. (and therefore taxable income of its partners, Louis Malanga, Alfred Malanga, and George Malanga) understated for 1968 by reason of receipt of checks from Robert Bossert and Co., Inc., from John F. Gambal, Inc., and from the Catt Corporation? 5. Were all or part of the underpayments of tax required to be shown on the returns of Louis and Mildred Malanga, George Malanga, and Alfred and Nancy Malanga for 1967, 1968, and 1969 due to fraud with intent to evade payment of taxes? 6. Is respondent barred by the statute of limitations from the assessment and collection of the deficiencies in income tax and additions to tax of Louis and Mildred Malanga, George Malanga, and Alfred and Nancy Malanga for 1967 and 1968? 7. Were all or part of the underpayments of tax required to be shown on the returns of C. F. Malanka & Sons, Inc., C. Salvatore & Sons, Inc., and Catt Corporation due to fraud with intent to evade payment of tax? 8. Is respondent barred by the statute *343 of limitations from the assessment and collection of the deficiencies in income tax and additions to the tax of C. F. Malanka & Sons, Inc., for the taxable years ended January 31, 1966, and January 31, 1968, and of C. Salvatore & Sons, Inc., for the taxable year ended April 30, 1968? FINDINGS OF FACT General FactsMal Bros. Contracting Co. (hereinafter Mal Bros.) during 1967, 1968, and 1969, was a partnership engaged in construction. Its partners were the brothers, Louis Malanga, Alfred Malanga, and George Malanga. Louis Malanga and Mildred Malanga, husband and wife, Alfred Malanga and Nancy Malanga, husband and wife, and George Malanga timely filed their respective income tax returns for 1967, 1968, and 1969 with the District Director, Newark, N.J. Mal Bros. and the individual taxpayers all filed returns for the calendar years mentioned. These individual petitioners all resided in New Jersey when their petitions were filed. C. F. Malanka & Sons, Inc. (hereinafter Malanka, Inc.), during tax years ended January 31, 1966, and January 31, 1968, was a corporation engaged in construction. Its majority stockholder and principal officer was Daniel Malanka. Malanka, Inc. timely filed *344 its income tax return for the foregoing fiscal tax years with the District Director, Newark, N.J. Its principal place of business was at Union City, N.J. C. Salvatore and Sons, Inc. (hereinafter Salvatore, Inc.), during the tax year ended April 30, 1968, was a corporation engaged in construction. Its dominant stockholder and principal officer was Philip Salvatore. Salvatore, Inc. timely filed its income tax return for the foregoing fiscal tax year with the District Director, Newark, N.J. Its principal place of business was at Montclair, N.J. The Catt Corporation (hereinafter Catt Corp.), during the tax year ended September 30, 1967, was a corporation engaged in construction. Its dominant stockholder and principal officer was Joseph Catanesi. Catt Corp. timely filed its income tax return for the foregoing fiscal tax year with the District Director, District of New Jersey. Its principal place of business was at Matawan, N.J. From February 18, 1965, through September 30, 1967, Mal Bros., Malanka, Inc., Salvatore, Inc., and Catt Corp. were associated in a joint venture known as the Southside Interceptor Sewer System (hereinafter the Joint Venture). This was for the design and *345 construction of an interceptor sewage system through which sewage would be transported from the City of Newark, N.J., to a treatment plant operated by the Passaic Valley Sewage Commission. Plans for this sewage project had commenced in 1954 with the initiation of the first of two preliminary surveys. In 1964 the contract for the design and supervision of the project was awarded. In the latter part of 1964, bids were invited for the awarding of the construction contract. On January 27, 1965, the contract was awarded to Salvatore, Inc., and the contract was signed on February 3, 1965, by Philip Salvatore, its president. On February 18, 1965, the Joint Venture was formed. Joseph Catanesi became the project manager of the Joint Venture. Mal Bros., Malanka, Inc., Salvatore, Inc., and Catt Corp. maintained their respective books and records on the accrual basis of accounting. Joint Venture income from the Southside Project was, pursuant to an election made on its partnership information return for the period ending September 30, 1967, reported on the completed contract basis. Respondent's Adjustments Still In Dispute Malangas The determination of deficiencies in tax against the Malangas *346 results from adjustments to the income of the Mal Bros. partnership as follows: 1967(a) The disallowance of the sum of $50,000 claimed as part of the cost of goods sold in 1967. This item involves a check for $50,000 payable to Kantor Supply Co., a fictitious entity. (b) An increase in partnership income for 1967 resulting from an increase in the Joint Venture distributable income for the period ending September 30, 1967, due to the disallowance of the sum of $186,182.20 claimed as expenses for four checks payable to Kantor Supply Co., a fictitious entity. 1968(c) An increase in partnership income for 1968 due to the admitted receipt of unreported income in the amount of $584,702.38 represented by one check from the New Jersey Turnpike Authority and three from the Port of New York Authority. (d) An increase in partnership income for 1968 due to the admitted receipt of unreported income in the amount of $29,548.88 represented by three checks from the following sources: Robert Bossert and Co., Catt Corp., and John F. Gambal, Inc. 1969(e) The disallowance of the sum of $1,176,848.71, which was an addmittedly overstated cost of goods sold for the taxable year 1969. Salvatore, Inc.*347 The determination of deficiency in tax against Salvatore, Inc., for the taxable year ended April 30, 1968, results in pertinent part from an increase in Joint Venture distributable income for the period ending September 30, 1967, due to the disallowance of the sum of $186,182.20 claimed as expenses by the Joint Venture for four checks payable to Kantor Supply Co., a fictitious entity. Catt Corp.The determination of deficiency in tax against Catt Corp. for the taxable year ended September 30, 1967, results from an increase in Joint Venture distributable income for the period ending September 30, 1967, due to the disallowance of the sum of $186,182.20 claimed as expenses by the Joint Venture for four checks payable to Kantor Supply Co., a fictitious entity. Malanka, Inc.The determination of a deficiency in tax against Malanka, Inc., for the taxable year ended January 31, 1966, results from a disallowance of the sum of $13,977.67 claimed as cost of goods and involving a check in that amount payable to Kantor Supply Co., a fictitious entity. The determination of deficiency in tax against Malanka, Inc., for the taxable year ended January 31, 1968, results in pertinent part from an increase *348 in Joint Venture distributable income, for the period ending September 30, 1967, due to the disallowance of the sum of $186,182.20 claimed as expenses by the Joint Venture for four checks payable to Kantor Supply Co., a fictitious entity. Issues 1-3 Joint Venture/Kantor Supply Co.During the period the Joint Venture was in operation (February 18, 1965, through September 30, 1967), Mario Gallo was an individual who, through Gallo Asphalt Co., North Jersey Incinerator Co., and North Jersey Concrete Pipe Co., manufactured and supplied materials essential to the construction industry such as pipe, pipe lining, asphalt, sand, gravel, and related products. Mario Gallo was deceased when these cases were tried.The Joint Venture awarded the contract for the pipe to be used in the Southside Sewer Project to North Jersey Concrete Pipe Co., which was operated by Mario Gallo. The contract price of the pipe used by the Joint Venturers and supplied by North Jersey Concrete was $1,924,471.50 without a discount. Mario Gallo told the Joint Venturers that pipe suppliers were being charged with price fixing in violation of the antitrust laws. To avoid such a charge with respect to the Joint Venture *349 pipe, Gallo asked the Joint Venturers 3 to agree to a stated 10-percent discount on the purchase of the pipe used in the Southside Project with the discount to be returned by the Joint Venture to Gallo at a later time. Pursuant to Gallo's instructions, the discount of $192,447 was largely returned by the Joint Venture in the form of the following checks issued by the Joint Venture to Kantor Supply Co., a fictitious entity: DateAmount8-24-65$ 9,983.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,350.0010-26-6572,949.2010-17-6669,900.00$186,182.20Kantor Supply Co. invoices were sent to the Joint Venture to support the issuance of checks but the Joint Venturers knew the invoices were fictitious. No one ever instructed the accountant for the Joint Venture about Kantor Supply Co., and the books and records of the Joint Venture reflected normal business transactions involving the acquisition of materials and supplies for these checks. Mario Gallo, on behalf of his various corporations, also directly issued and signed many checks *350 payable to Kantor Supply Co. Joseph Catanesi, the project manager for the Joint Venture, and Louis Malanga signed most of the checks for the Joint Venture. They signed the four checks to Kantor Supply Co. from the Joint Venture. Catanesi had known Mario Gallo and Gallo's father for over 20 years; Louis Malanga knew Mario Gallo very well for over 20 years. Louis was a godfather to one of Gallo's children. The Joint Venturers never had any formal final reconciliation with Mario Gallo concerning the 10-percent discount, but it was expected that any balance between the total discount and the amounts paid Kantor Supply Co. would be made up on subsequent dealings with Gallo. During the taxable years in issue, Mal Bros. was on an accrual method of accounting. It maintained normal books of account including a general ledger, cash receipts book, sales book, purchase book, and subsidiary records such as accounts receivable and payable. Dorothy Friedman was the bookkeeper for Mal Bros. for more than 15 years and made the day-to-day entries in Mal Bros.' books during these years. Edward Schiffer was an accountant who performed services for Mal Bros. from 1956 to 1970.He devoted about 2 days *351 each month to posting the book entries made by Friedman to the general ledger, reconciling the bank statements, etc. He also prepared the income tax returns for Mal Bros. and the Malangas for the years here involved. He was not employed by Mal Bros. on a day-to-day basis.Isidore Rosenblum is a certified public accountant with an accounting firm specializing in the construction industry. In August of 1970, he was engaged by Mal Bros. to take over the accounting work for the partnership and the partners.Prior to and during the years 1967 and 1968, Mal Bros. purchased materials and supplies from Gallo companies in an amount in excess of several million dollars. Gallo companies were also subcontractors on Mal Bros. projects. For some years prior to 1967, and during 1967 and 1968, Louis Malanga and Mario Gallo engaged in a relationship which involved the issuance of checks in identical amounts to one another.These transactions were done as a favor by Louis to Gallo and were considered by Louis to have been exchanges. The books of Mal Bros. show that a check dated October 23, 1967, was issued to Kantor Supply Co. in the amount of $50,000. There were corresponding entries for this *352 amount in both the cash disbursements book and the purchase book. The books also reflect that on or about October 23, 1967, Mal Bros. received an amount of $50,000 from Gallo Asphalt Co. which was entered into the cash receipts book. Because there was no sales invoice, the amount was credited to accounts receivable, but not entered into the sales book. At the close of 1967, the balance sheet carried this credit in the name of Gallo Asphalt Co., and the amount was not, as a result, reported in income in 1967. On May 9, 1968, when it was discovered that this was still being carried as a receivable, it was posted to the sales book and became income reported in 1968. The books of Mal Bros. show that a check dated February 6, 1968, was issued to Kantor Supply Co. in the amount of $47,500. An entry was made in the purchase book in this amount. The books also reflect that on or about February 6, 1968, Mal Bros. received an amount of $47,500 from North Jersey Incinerator Co. which was entered in the sales book and reported as income in 1968, thus creating a wash. 4When respondent's agents questioned *353 the issuance of the Kantor checks, Isidore Rosenblum analyzed Mal Bros. books and records. His analysis revealed the fact of an exchange although such appeared as income and disbursements. Upon inquiry, Rosenblum discovered that only Louis knew of and could give an explanation of the situation. During 1967 and 1968, and prior thereto, Mal Bros. did not perform any services for or sell materials to Mario Gallo companies, including Gallo Asphalt Co. and North Jersey Incinerator Co.Malanka, Inc./Kantor Supply Co.Daniel Malanka signed one check drawn by C. F. Malanka & Sons, Inc., payable to Kantor Supply Co., dated February 17, 1966, for $13,977.67. Malanga testified that his company needed a particular type of pipe for a job it was doing and he asked Gallo for it. Gallo said he did not have it but he could get it for Malanka from Kantor Supply Co. The check to Kantor was supported by an invoice from Kantor Supply, and Malanka testified that he remembered seeing the pipe delivered by a Kantor Supply truck. The invoice did not list any pipe and no pipe was delivered to Malanka. Kickbacks to City OfficialsIn 1970 Mayor Addonizio of Newark, city officials, and others, including *354 Mario Gallo, were convicted of a conspiracy to violate the Hobbs Act by extorting kickbacks from engineers, suppliers, and contractors on the Southside Sewer Project in Newark, including the Salvatore Joint Venture and the Joint Venturers. Kantor Supply Co. was found to be a vehicle used in that conspiracy. The conviction was affirmed by the Court of Appeals for the Third Circuit, United States v. Addonizio,451 F.2d 49 (1972). Issues 4-6Mal Bros. Omitted Income for 1968In 1968 Edward Schiffer, an accountant who spent 1 or 2 days a month working at Mal Bros., cashed the following checks payable to Mal Bros. at the Broadway National Bank in Bayonne, N.J., on behalf of Mal Bros.: DrawerDateAmountNew Jersey TurnpikeAuthority7-25-68$322,282.12The Catt Corporation8-30-6818,581.88John F. Gambal, Inc.,& General A.P.S. Con-tractors, A JointVenture9-5-685,000.00The Port of New YorkAuthority9-23-68139,600.74The Port of New YorkAuthority9-27-6866,300.00The Port of New YorkAuthority10-17-6856,519.52$608,284.26 Mal Bros. did not have an account at this bank. Schiffer left these checks at the Broadway Bank and through the cooperation of a bank teller known to Schiffer they were endorsed as *355 though Mal Bros. had an account there, thus avoiding the issuance of a Treasury Currency Report. The proceeds of the checks were used to purchase bearer bonds through the Broadway National Bank. The Malangas were aware of these transactions, and George Malanga actually received the bonds. George Malanga told Louis Malanga and Alfred Malanga about the bonds. These checks, which represented 1968 income of the partnership, were not recorded on the cash receipts journal or the sales register of Mal Bros. for 1968. 5The checks of Mal Bros. that were cashed at Broadway National Bank in 1968 were recorded in the Mal Bros. books as sales in 1969 and were reported as income on the partnership information return for 1969. It is stipulated that the income should have been reported in 1968. Additional checks representing income to Mal Bros. in 1969, totaling about $900,000, were cashed in a similar manner in 1969 and used to purchase bearer bonds that were received by George Malanga. However, *356 these checks were reported as sales and included in income for 1969. The partnership return for 1969 was filed after tax counsel in this case had been retained.The Internal Revenue agents uncovered the check cashing scheme at the Broadway National Bank only in tracing one check through the recordack system at that bank. Schiffer was aware from the beginning that the procedure used to cash checks at the Broadway National Bank was questionable and not in the ordinary course of business. Schiffer would instruct the Broadway National Bank as to the type of bearer bonds that were to be purchased. The Broadway National Bank bought the bearer bonds on behalf of the Malangas for the checks that were cashed. The National Newark and Essex Bank at which the Mal Bros. had its business account was only about 1 mile from the principal place of business. A total of approximately $1,506,000 in bonds were purchased through Schiffer at the Broadway National Bank in 1968 and 1969. It was the duty of Dorothy Friedman, the bookkeeper at Mal Bros., to deposit checks payable to Mal Bros. in its bank account.She sometimes put checks that were received by Mal Bros. that she allegedly withheld for Schiffer *357 in the office safe at Mal Bros. George, Louis, and Alfred Malanga had access to the office safe at Mal Bros. Schiffer did not have access to the office safe himself. Friedman notified the Malangas of large checks that came into Mal Bros. Friedman had no recollection of giving any of the above unreported cashed checks of Mal Bros. to Schiffer. Art Weiss, the general manager and chief engineer at Mal Bros., had his own system of bookkeeping for determining whether Mal Bros. had been paid subsequent to bills being sent. Weiss instructed his secretary, as a system of cross-checking, to check with Friedman each month to make sure their records agreed as to checks that were received. If a check was not received, Weiss would inquire of the Malangas to see why they had not been paid. The Malangas borrowed money from banks many times and had to present financial statements. The Malangas examined the financial statements which were presented to the banks and knew the financial position of Mal Bros. Art Weiss prepared reports of the financial position of the business, cost sheets, cash flow statements, bank balances, and receivables which the Malangas discussed with him at monthly meetings *358 or more often. Art Weiss' records show that a check of $322,282.12 was paid to and received by Mal Bros. from the New Jersey Turnpike Authority. All three partners of Mal Bros. signed checks of Mal Bros. and two of the three were required to sign for a check to be authorized. Mal Bros. Overstatement of Cost of Goods Sold in 1969It is stipulated that partnership income of Mal Bros. was understated for 1969 by the amount of $1,176,848.71 as a result of improper entries in the purchase journal under date of December 31, 1969, for amounts owed to sub-contractors that had not yet been billed. In early 1970, Schiffer prepared a tentative profit and loss statement for the partnership for 1969. When he showed this to the partners he was told that there were additional expenses which he had not included. Shortly thereafter Friedman was handed a list of unpaid estimates totaling the above amount, and she made entries in the purchase journal that included these items for 1969. She had never before received a list of estimates of payables like the one she used for these entries. Normally, Art Weiss, the office manager, prepared the estimates to be posted and gave them to Friedman. The *359 procedure followed in this instance is, however, not clear. Friedman could not remember issuing checks shortly after the foregoing entries were made, although this was normally done. After succeeding Schiffer as Mal Bros. accountant in August 1970, Isidore Rosenblum reviewed Mal Bros. 1970 records and saw some unusual balances listed as being due to subcontractors that were not being paid. Rosenblum found that these were not actual obligations as of 1969 and reversed the original purchase entries in some way with the result that most, if not all, of the error in 1969 was offset by higher taxable income in 1970. He explained that the items in question for 1969 were eventually paid. Issues 7 and 8The facts with respect to these issues are set forth above. The basis for fraud alleged by respondent against Malanka, Inc., for 1966 is the claimed deduction of the sum of $13,977.67 paid to Kantor Supply Co. The basis for fraud alleged by respondent against Malanka, Inc., for 1968, Salvatore, Inc., for 1968, and Catt Corp. for 1967, are the deductions claimed by the Joint Venture for the four checks paid to Kantor Supply Co. ULTIMATE FINDINGS OF FACT Issue 1Payments made by the Joint *360 Venture in the form of checks made payable to Kantor Supply Co., were in reality kickbacks that eventually were received by the Mayor of Newark and other city officials and co-conspirators. They were not payment for materials or supplies received. Issue 2The check drawn to Kantor Supply Co. by Mal Bros. in 1967 was in exchange for a check of Mario Gallo's in an identical amount, but partnership income of Mal Bros. was understated for 1967 as a result thereof. Issue 3The check drawn by Malanka, Inc., to Kantor Supply Co. was not a payment for cost of goods sold, and corporate income of Malanka, Inc., was understated for the fiscal year ended January 31, 1966, as a result thereof. Issue 4Partnership income of Mal Bros was understated for 1968 by reason of receipt of checks from Robert Bossert & Co., Inc., from John F. Gambal, Inc., and from Catt Corp.Issues 5 and 6All or part of the underpayments of tax required to be shown on the returns of Louis and Mildred Malanga, George Malanga, and Alfred and Nancy Malanga for 1968, but not 1967 and 1969, were due to fraud with intent to evade payment of taxes. Issues 7 and 8All or part of the underpayment of tax required to be shown *361 on the return of Malanka, Inc., for the taxable year ended January 31, 1966, and on the returns of Malanka, Inc., for the taxable year ended January 31, 1968, Salvatore, Inc., for the taxable year ended April 30, 1968, and Catt Corp. for the taxable year ended September 30, 1967, was due to fraud with intent to evade tax. OPINION Issues 1-3At issue in several dockets here is the status of deductions taken by the Joint Venture, Mal Bros., and Malanka, Inc., for checks drawn to Kantor Supply Co. Relying upon section 162(c)(1), 6*362 *363 which disallows a trade or business expense deduction for illegal payments to government officials or employees, respondent contends the Kantor payments are nondeductible because they represented illegal bribes or kickbacks. As section 162(c)(1) provides, the burden of proof in respect of whether a payment constitutes an illegal bribe or kickback shall be upon respondent to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud). Thus, the burden of proof is to be carried by clear and convincing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure. With respect to the Joint Venture checks drawn payable to Kantor Supply Co. totaling $186,182.20, petitioners 7 claim they were part of the purchase price for pipe supplied by one Mario Gallo through his company, New Jersey Concrete Pipe Co. Petitioners admit that Kantor Supply Co. never furnished any materials or services even though phony invoices and delivery tickets were prepared. The Kantor checks, petitioners argue, were so issued as a favor to Mario Gallo. They claim that although their written agreement with Mario Gallo gave them a stated 10-percent discount on the pipe he supplied and the billings from his company reflected such a discount totaling $192,447, they also agreed with Mario Gallo to return the discount to Gallo. They claim the four Kantor checks were, per Gallo's instructions, a return of the discount. This arrangement, petitioners explain, was agreed to so that Gallo could avoid price-fixing charges under the antitrust laws. These claims were supported by testimony of Joseph Catanesi, Philip Salvatore, Louis Malanga, and *364 Daniel Malanka. Because Mario Gallo is dead, respondent is hard pressed to discredit petitioners' version of events.Straining to do so, respondent asks us to use judicial notice to find that the proceeds from the Kantor Supply Co. checks involved herein were used to pay off Officials of the City of Newark for the privilege of doing business with the city. Respondent relies on the public record and the Court of Appeals opinion in United States v. Addonizio,451 F. 2d 49 (3d Cir. 1972), as a basis for such a finding here. There, Newark city officials, including former Mayor Addonizio, were convicted of a conspiracy involving the extortion of kickbacks from contractors, suppliers, and engineers engaged in the construction of certain municipal projects in Newark and, in particular the Southside Project. Kantor Supply Co. was found to be a vehicle used in that conspiracy. This Court will take judicial notice of the opinion of the Third Circuit in the Addonizio case cited above and the concomitant notice that Mayor Addonizio *365 of Newark and his co-conspirators were convicted of violating the Hobbs Act by extorting kickbacks from engineers, suppliers, and contractors on the Southside Sewer Project in Newark, including the Salvatore Joint Venture and the Joint Venturers. However, we will not take judicial notice of the conclusion of fact made by the jury (or by the appellate court) as proof that the payments made by petitioners herein and the Joint Venture to Kantor Supply Co. were in fact payments of the extortion demands of the conspirators in that case. Rule 201 of the Federal Rules of Evidence provides that a court may, and must under certain circumstances, take judicial notice of "adjudicative facts" if such facts are not subject to reasonable dispute. The rule itself does not define "adjudicative facts" but the Advisory Committee's note does discuss the subject, stating, in part, that adjudicative facts "are simply the facts of the particular case" and are "those to which the law is applied in the process of adjudication." We cannot be sure whether the facts of which respondent requests that we take judicial notice qualify as "adjucative facts" or not, but we believe it would be an abuse of the trial *366 process for us to conclude, solely on the basis of the record in the Addonizio case, that the Kantor payments were known by the parties in this case to be extortion payments. The record in the Addonizio case was not offered in evidence in this case, except for the testimony of Kantor hereinafter discussed, and our only knowledge regarding the evidence in that case is limited to the recitation thereof in the Circuit Court opinion. None of the individual petitioners in this case were parties in the Addonizio case, and so far as we can determine none of the witnesses in this case testified as witnesses in the Addonizio case. The factual conclusions reached in that case were based on the testimony of the witnesses in that case, and the petitioners in this case had no opportunity to confront or cross examine those witnesses. Since the principal issues in this case are the nature of the Kantor payments as made by petitioners and petitioners' intentions with regard thereto, petitioners would be foreclosed from their day in court if we take judicial notice of and are bound by the factual conclusions in the Addonizio case. 8*367 The only direct evidence respondent has offered to support his contention that the Kantor payments were for illegal bribes or kickbacks is the prior testimony of Irving Kantor, who was dead at the time of the trial in this case, in United States v. Addonizio,supra. From a Veteran's Administration Hospital where he had been a patient for some 6 months, Kantor testified, in relevant part, as follows. Toward the end of 1962 Joe Biancone, one of the defendants in Addonizio, asked Kantor to cash checks for him in order that certain contractors could make required payments to his boss. (Later Kantor learned Biancone's boss was Tony Boiardo.) To this end, in January 1963 Kantor opened a Kantor Supply bank account. Kantor Supply, however, was not a real company. Kantor took the checks Biancone gave him, deposited them, and when the checks cleared, he returned 95 percent of the face value *368 of the checks to Biancone. Kantor retained the other 5 percent as his profit. Also, at Kantor's suggestion, Kantor issued phony invoices in the face value of the amount of the checks to Biancone. In turn, Biancone gave the invoices to the contractors who wrote the checks. When Kantor first talked with Biancone, Biancone did not indicate which contractors had to pay his boss in cash. But as the checks arrived from Biancone and the invoices from Kantor Supply went out, Kantor saw the names of the various contractors. In about 1966, Kantor learned that Biancone was acting on behalf of someone else. At that time Biancone told Kantor that the bid for the "Senior Citizens Housing" had been received and the low bidder was Herman Braun. Biancone asked Kantor to meet with Braun and tell him if he wanted to make his bid stick, he would have to pay 3 percent of the amount of the bid in cash to Kantor, and Kantor would give it to Biancone. Kantor so informed Braun who later was told by Biancone that the money was needed for Mayor Addonizio's election. But Braun would not pay it, and he lost the contract. Among others, these checks were identified by Kantor as being supplied by Joe Biancone *369 and converted into cash by Kantor using the Kantor Supply Co. scheme: DrawerDateAmount1. C. Salvatore & Sons, Inc.,Southside Project8-24-65$9,983.002. Mal Bros. Contracting Co.9*370 ? 9,950.003. C. Salvatore & Sons, Inc.,Southside Project33,350.004. C. Salvatore & Sons, Inc.,Southside Project72,949.205. Passaic Crushed Stone, Inc.(signed by Mario Gallo)10,000.006. Mal Bros. Contracting Co. 9,988.757. Mal Bros. Contracting Co.9,990.508. Passaic Crushed Stone, Inc.(signed by Mario Gallo)12-15-6521,400.009. Gallo Asphalt Co.12-15-6534,900.0010. Central Jersey ConcretePipe Co.12-15-6511. C. Salvatore & Sons, Inc.,Southside Project69,000.0012. C. F. Malanka & Sons, Inc.13,977.6713. Passaic Crushed Stone, Inc.(signed by Mario Gallo)25,000.0014. Malanka Brothers Contract-ing Co.45,000.0015. Central Jersey Pipe Co.(signed by Mario Gallo)$44,756.2516. Passaic Crushed Stone, Inc.(signed by Mario Gallo)55,338.7517. Gallo Asphalt Co.(signed by Mario Gallo)35,750.0018. Central New Jersey AsphaltCorp. (signed by Mario Gallo)12,400.0519. Gallo Asphalt Co.(signed by Mario Gallo)68,400.1720. Passaic Crushed Stone, Inc.(signed by Mario Gallo)23,650.5021. Gallo Asphalt Co.(signed by Mario Gallo)29,745.0022. Passaic Crushed Stone, Inc.(signed by Mario Gallo)38,650.0023. Hudson Crushed Stone SalesCo., Inc. (signed by MarioGallo)28,250.0024.Mal Bros. Contracting Co.27,500.0025. Gallo Asphalt Co.44,250.00Kantor's check cashing system for Biancone continued, but as of 1967 Biancone's brother-in-law, Anthony Gagliano, gave Kantor the checks. Thereafter, these checks were cashed by Kantor using the Kantor Supply Co. account: DrawerDateAmount1. Mal Bros. Contracting Co. $50,000.002. Gallo Asphalt Co.(signed by Mario Gallo)56,543.003. Conduit and Foundation Corp.& Mal Bros. Contracting Co.17,985.83Finally, Kantor admitted that he did not report his 5-percent profit from the Kantor Supply Co. check cashing arrangement for income tax purposes. Kantor's prior testimony was received at trial here subject to petitioners' motion to strike. They object to it on grounds of relevancy, materiality, and the hearsay rule. We think it marginally satisfies these standards for admissibility but, as will be discussed, we cannot give it the weight respondent attaches to it. The hearsay objection warrants further discussion. The parties agree that the prior testimony is hearsay, see Rule 802, Federal Rules of Evidence ; 10 the dispute is over whether the prior testimony is *371 admissible as a hearsay exception.& Under Rule 804(b), several hearsay exceptions are provided where, as here, the declarant is unavailable as a witness. We agree with respondent that the prior testimony is admissible under Rule 804(b)(3) as a statement against interest.Pursuant to Rule 804(b)(3) a statement against interest is not excluded by the hearsay rule if the declarant is unavailable as a witness. A statement against interest is defined as: A statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statemenit. [Fn. omitted.] We believe Kantor's testimony at the criminal trial was, at the time of its making, contrary *372 to Kantor's pecuniary interest and tended to subject him to civil or criminal liability. First, Kantor described how he attempted to induce a Herman Braun to pay a bribe or kickback to Joe Biancone, through Kantor, for use in Mayor Addonozio's election, if Braun wanted to retain a contract he had been awarded. Apparently this confession would tend to subject Kantor to some criminal liability. In any event, Kantor's admission that he did not report his 5-percent profit from the check-cashing scheme for income tax purposes was contrary to his pecuniary interest, and tended to subject him to at least civil liability. This is because failure to report his fees would give rise to deficiencies and perhaps some addition to tax (e.g., for negligence or fraud). To be admissible under Rule 804(b)(3), however, a second requirement is that the declaration against interest must be such "that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true." Contrary to petitioners' contention, Rule 804(b)(3) does not require actual awareness of the declaration being against interest. It is sufficient that a reasonable man would have held the *373 requisite belief. 11Whether a dying12 declarant would not have made declarations implicating himself in an attempted bribery or kickback scheme unless he believed them to be true is a close question.Compare United States v. Bagley,537 F.2d 162 (5th Cir. 1976) (slight chance that declaration to a friend and cellmate might be used against him held sufficiently against interest). Whatever the outcome of that analysis, we believe a reasonable man, though dying, *374 would not admit to failing to report illegal income on his income tax return unless he believed the statement to be true. The likely consequence of such a statement is an assertion of a deficiency against the declarant or his estate. Having satisfied the standards of Rule 804(b)(3), Kantor's prior testimony is admissible hearsay. 13*375 Returning to the substantive issue, we find that Kantor's testimony is not as helpful to respondent as claimed. To begin, no connection is made between the partners in the Joint Venture and Kantor. Kantor's testimony does not directly contradict petitioners' *376 14 testimony that they delivered their Kantor payments to Mario Gallo in partial payment for pipe Gallo supplied the Joint Venture. The petitioners 15 denied taking part in a bribery or kickback scheme, and Kantor did not directly implicate petitioners in any way. Perhaps the checks mentioned by Kantor, to the extent they are the same as those in issue here, were delivered to Biancone or Gagliano by Gallo for some illicit purpose. However, Kantor's testimony does little to demonstrate that the petitioners were involved in a bribery or kickback scheme in the Southside Project. 16*377 Kantor confessed to soliciting an apparent bribe or kickback for Biancone with respect to the "Senior Citizens Housing" in about 1966, but his testimony falls critically short on any such details about the Southside Project. Petitioners claim that the Kantor checks were drawn to Kantor Supply as a favor to Gallo and were intended as a repayment to Gallo of the 10-percent discount he allowed the Joint Venture on the pipe he supplied for the Southside Project. They so testified, and we cannot disregard their testimony where it is not contradicted unless we think it is "improbable, unreasonable, or questionable," Demkowicz v. Commissioner,551 F. 2d 929 (3d Cir. 1977). However, neither can we in good conscience ignore what we believe to be the realities of the situation. Aside from the Kantor testimony, respondent has relied on circumstantial evidence to prove that these payments were knowingly made as illegal kickbacks and that the fictitious Kantor invoices were used to justify deduction of those amounts.Indeed he must because Gallo and Kantor were dead at the time of this trial and presumably Biancone and Boiardo, the two collectors for the conspirators, were unavailable *378 or wuld be uncooperative as witnesses. However, it is well recognized that respondent can meet his burden of proof with circumstantial evidence. Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. per curiam 578 F. 2d 1383 (8th Cir. 1978). The circumstances, as gleaned from the Kantor testimony, the Third Circuit opinion in Addonizio, and not denied by petitioners, were that the mayor and members of the city council of Newark, and others, demanded that any engineer, supplier, or contractor on a Newark public works job pay 10 percent of the amounts he received under contracts with the city as kickbacks to the conspirators. The Southside Project was one of the projects on which the demands were enforced. The amounts purportedly paid by the Joint Venturers to Kantor Supply ended up in the hands of the conspirators, and this would be expected since the Joint Venture was the prime contractor on the Southside Project. But petitioners say they had no idea that their Kantor payments were being used for kickback purposes. We simply cannot accept petitioners' explanation of these payments. We feel quite certain that it became well known throughout the construction industry that if *379 a contractor took on a city contract he would be required to kickback some percentage of his payments under the contract. Petitioners would have us believe that they were never approached on this subject but that the Joint Venture paid over to a fictitious supplier, from whom they admittedly received no supplies, a total of more than $186,000 just for Gallo's convenience. It may be that they did not know positively that some of these funds would end up in the hands of the city officials, but even that is suspect under the Circumstances.Gallo himself was one of the indicted conspirators. Furthermore, some of the Joint Venturers had done business with Gallo before and had not experienced a similar proposal from him. One of the petitioners testified that Gallo's prices were usually lower than the prices of other suppliers, so there was no sound reason for him to give a discount as such. We also have trouble reconciling petitioners' testimony with the fact that they received invoices from Kantor for supplies they never received. They were certainly experienced enough to know that they would have to have some support for the deduction of these amounts for tax purposes and it would *380 have been much easier to reflect on their books that these payments were for Gallo pipe, rather than nonexistent pipe, if such was the case. And while petitioners' evidence was that the costs represented by the Kantor checks were not billed to the city under the contract, we find it hard to understand just what did happen. It would seem that the payments had to be charged to either the Gallo pipe or the nonexistent Kantor supplies and in either event would have been charged to the city, since this was the only project of the Joint Venture. Furthermore, there were certain inconsistencies in the testimony of the Joint Venturers, except with respect to the purpose of the Kantor payments, which leads us to believe that their version of the transaction was preconceived. While the evidence is not as strong as it could be, we conclude from all of the above factors and the record as a whole that respondent has carried his burden of proving by clear and convincing evidence that the checks of the Joint Venture drawn to Kantor Supply Co. were illegal kickbacks and were not payments for materials or supplies. We find the testimony of the petitioners and Joint Venturers on this subject to be *381 improbable, unreasonable, and questionable. We conclude that the Kantor payments were not deductible by the Joint Venture and that the deduction thereof on the return for the Joint Venture was with intent to evade tax. Consequently, the returns of the Joint Venturers reflecting their distributive shares of the Joint Venture were fraudulent with intent to evade tax. With respect to the Mal Bros. partnership, only one Kantor check is in issue, 17 a 1967 check for $50,000. According to Louis Malanga's testimony, over the years Mal Bros. purchased millions of dollars worth of pipe, gravel, and other supplies from Mario Gallo. In addition, Louis had a personal relationship with Gallo; indeed, he was a godfather to one of Gallo's children. Louis explained that Gallo had come to him and requested that he do Gallo a favor, namely, that in exchange for checks Gallo would give Louis, Louis would give him a check in the same amounts made payable to Kantor Supply Co. In turn, gallo mailed phony Kantor Supply Co. invoices to Mal Bros. He further testified that he never discussed this exchange of checks with his partners. Nor did he tell the bookkeeper, Dorothy Friedman, about the transaction. *382 Without knowledge of the exchange of checks, Friedman recorded the Kantor Invoices received in the mail as amounts payable in 1967. Isidore Rosenblum, a CPA employed by Mal Bros. in August 1970, analyzed the books and records of the partnership with respect to the Kantor checks. He testified that the books reflected what was in effect an exchange of checks with Gallo companies. Rosenblum explained that for the $50,000 check drawn by Mal Bros. to Kantor Supply Co. there were corresponding entries of that amount in both the cash disbursement and purchase journals; that the partnership records reflected a cash receipt of $50,000 from the Gallo Asphalt Co., and that the net effect should have been a wash. However, the receipt of Gallo's check was not recorded in the sales journal. (In an annual financial statement, this amount was shown as a credit to accounts receivable.) As a result, a $50,000 purchase was reflected in cost of goods sold without the offsetting inclusion of $50,000 in sales. But in 1968 when the error was discovered, it was posted to sales. *383 18 The effect of Rosenblum's testimony is that the purported 1967 exchange of checks, through bookkeeping error, did not wash in 1967. Again, since the testimony of Louis Malanga and Isidore Rosenblum was not contradicted, it provides the only basis in the record for reaching a conclusion. Also, the credibility of Louis' testimony is supported by the similar exchange of checks with Gallo in 1968 which respondent has conceded had no tax effect. See footnotes 17 and 18, supra. Since Mal Bros. itself had no contracts with the city at the time, we have found that the 1967 Mal Bros. partnership check drawn to Kantor Supply Co. did not represent an illegal bribe or kickback to a government official or employee. With respect to Malanka, Inc., one Kantor check *384 for $13,977.67 dated February 17, 1966, is at stake. For the taxable year ended January 31, 1966, petitioner deducted as a cost of goods sold $13,977.67 as a payable to the fictitious Kantor Supply Co. Invoices from Kantor Supply Co. dated in January of 1966 and showing materials (other than pipe) supplied were used to support this deduction. Daniel Malanka, petitioner's majority stockholder and principal officer, testified that petitioner needed a porous-type pipe for a government contract that Mario Gallo did not make, and petitioner had no source of supply; that Gallo told him he would obtain the pipe from Kantor Supply Co.; that the pipe was delivered by Kantor Supply Co. on a big rack truck; that he personally checked some of the invoices; and that he signed the Kantor check in issue as payment for the pipe. Since Kantor Supply Co. did not exist, Daniel Malanka's testimony that he gave Gallo the Kantor Supply Co. check under these circumstances makes no sense. Although the record does not support a finding that this Kantor check represents an illegal bribe or kickback to a government official or employee as contended by respondent, we are convinced that Daniel Malanka fabricated *385 this testimony and that the $13,977.67 was not paid for materials or supplies or anything else properly included in cost of goods sold. Consequently, the deduction of $13,977.67 as part of the cost of goods sold was improper and Malanka, Inc.'s income for fiscal 1966 was understated in that amount. The understatement was due to fraud with intent to evade tax. Issue 4The next issue is whether the partnership income of Mal Bros. was understated for 1968 by reason of the receipt of checks from Robert Bossert & Co., Inc., from John F. Gambal, Inc., and from the Catt Corp.19 At trial counsel for petitioners stipulated that these three checks were properly includable in income for 1968, denying only that the failure to report the income was fraudulent. By brief petitioners attempt a change in position but are precluded from now reopening the issue. Under Rule 91(e), Tax Court Rules of Practice and Procedure, a stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict *386 a stipulation in whole or in part, except that it may do so where justice requires. Petitioners offer no suggestion regarding why they should be permitted to contradict their stipulation, and we find they are now precluded from reopening this issue. Related to this issue is the cashing of New York Port Authority and New Jersey Turnpike checks to Mal Bros. which were used to purchase bonds. Petitioners have also conceded that these checks represent unreported income to Mal Bros. in 1968 but claim that the failure to include them in income for 1968 was not fraudulent. These transactions are discussed under Issues 5 and 6 following. Issues 5 and 6The final issue with respect to docket No. 6848-73, Louis and Mildred Malanga, petitioners; docket No. 6850-73, Estate of Alfred Malanga and Nancy Malanga, petitioners; and docket No. 6853-73, George Malanga, petitioners, is: Were all or part of the underpayments of tax required to be shown on the returns of Louis and Mildred Malanga, Alfred and Nancy Malanga, and George Malanga for 1967, 1968, and 1969 due to fraud with intent to evade payment of taxes? One *387 consequence in determining this issue is whether the addition to tax for fraud under section 6653(b) 20 applies. The outcome of this issue also will determine whether respondent is barred by the statute of limitations from the assessment and collection of the deficiencies in income tax and additions to the tax of Louis and Mildred Malanga, Estate of Alfred Malanga and Nancy Malanga, and George Malanga for 1967 and 1968.This is because respondent relies upon section 6501(c)(1) to keep these years open. If section 6501(c)(1) does not apply, 1967 and 1968 are closed by operation of section 6501(a). 21*388 Again, respondent has the burden of proof with respect to fraud, which burden is to be carried by clear and convincing evidence. Sec. 7454(a); Rule 142, Tax Court Rules of Practice and Procedure.Respondent's only basis for fraud for 1967 arises from his determination that the Malanga brothers knowingly and intentionally underreported their partnership income from Mal Bros.*389 as a result of the check of Mal Bros. for $50,000 payable to Kantor Supply Co. that was deducted as a cost of goods sold on the partnership return for 1967. We have already found that this amount was intended to be an exchange of checks with Gallo and a wash transaction in 1967; 22 and that it was not an illegal bribe or kickback. As such it does not support a finding of fraud for 1967. As a result, respondent is barred by section 6501(a) from the assessment and collection of the deficiencies 23 in income tax of Louis and Mildred Malanga, Estate of Alfred Malanga and Nancy Malanga, and George Malanga for 1967. For 1968, respondent's basis for fraud, in addition to Mal Bros.' underreporting of its distributive share of the Joint Venture income resulting from the Kantor checks and the consequent underreporting of their shares of Mal Bros. income, is the alleged intentional underreporting by Louis, George, *390 and Alfred Malanga (now deceased) of their partnership income from Mal Bros. as a result of the failure to include in the income of Mal Bros. as shown on the partnership return for 1968 the amount of $608,284.26. This amount, which has been stipulated as income in 1968, is attributable to six checks payable to Mal Bros. and received by them in 1968. 24*391 These checks were cashed and not reported as income for 1968 on the books and records of Mal Bros. These checks were cashed at the Broadway National Bank in Bayonne, N.J., at which bank Mal Bros. did not have an account. Louis, George, and Alfred Malanga likewise did not have an account at this bank.The six checks cashed at Broadway National Bank were endorsed as though deposited in an account of Mal Bros. at the bank. The proceeds of the checks cashed at the Broadway National Bank were admittedly used to purchase bearer bonds through the bank. George Malanga admitted that he received the bearer bonds in question and told his brothers about them. The Malangas' position is that they had no knowledge of the omission from income and no knowledge that these same checks were cashed in a highly irregular manner. Their testimony in this regard was contradicted and we do not believe it. Edward Schiffer, an accountant for Mal Bros. during the years in issue, testified as a witness for respondent. He testified that he presented all these checks to the bank for payment and ordered the purchase of the bearer bonds through the bank. Schiffer testified that on each occasion when a check was to be cashed, Louis and George Malanga would either bring the check to Schiffer's office or meet him at the bank. He testified that on each occasion Louis and George Malanga went with him to the bank and waited outside while he went in and cashed the checks that were payable to Mal Bros.He further testified that he obtained a receipt from the bank for the checks and signed on the receipts, "This is the property of Louis, George and Alfred Malanga" and gave that receipt to Louis and George Malanga who were waiting outside the bank. Schiffer testified that when the bearer bonds were to be picked up at a *392 later date, Louis and George Malanga would again come to the bank with him and sit in their car outside the bank. He testified that he would give them the bearer bonds and they would give him back the receipt that he previously gave them. Finally, Schiffer testified that he thought the income related to these checks was reported by Friedman. Louis and George Malanga denied that they went to the bank with Schiffer, and petitioners claim that the omission of these items from the sales journal was at the insistence of Schiffer, not at the insistence of the partners. In support of their version of events, Dorothy Friedman, the bookkeeper for Mal Bros. during the years in issue, testified that Schiffer instructed her to withhold certain checks and not to post the related "estimates" (billings) in the sales journal. Also, according to Friedman, the partners did not tell her to withhold the posting of billings or know of Schiffer's instructions to withhold the postings. Contrary to this testimony, however, at another point Friedman testified that she would have entered in the sales journal any checks she withheld for Schiffer. She also testified that Schiffer told her to erase an entry *393 on the Mal Bros. sales journal for 1968 for one of the cashed checks. Schiffer was physically present at Mal Bros. only one or two days a month. The handling of checks was not part of his usual duties. George Malanga testified that Schiffer was not in the practice of taking Mal Bros. checks.Friedman, the bookkeeper, testified that she sometimes put checks that she withheld from deposit, allegedly at Schiffer's direction, in the office safe. George, Louis and Alfred Malanga had access to the office safe, but Schiffer did not. Friedman had no recollection of giving any of the checks that were cashed at the Broadway National Bank to Schiffer. We are convinced by the record that Louis, George, and Alfred Malanga knew that the six checks cashed at Broadway National Bank and used to purchase bonds were cashed in a highly irregular manner and that this was done in a fraudulent attempt to underreport their partnership income from Mal Bros.First, Louis and George Malanga's claimed ignorance of the check cashing and bond purchase scheme is too incredible to believe. To begin, the bearer bonds purchased with these checks were delivered by Schiffer to George Malanga. This was clearly admitted *394 by George Malanga and conceded by petitioners in their brief. We are troubled by the Malangas' testimony that Schiffer, an accountant who spent just 1 or 2 days a month on the Mal Bros. premises, could take physical custody of such large checks drawn to the order of Mal Bros., purchase bonds with them, and turn them over to the Malangas without their participation. Louis Malanga testified that he believed Schiffer pocketed the proceeds of the checks in question; that at one time Schiffer was instructed to buy bonds whenever the partners' bank account was sufficient; that he instructed Schiffer to stop buying bonds in 1964 or 1965; that he did not recall Schiffer giving him bonds after 1965; but that Schiffer might have had instructions during 1965 to 1969 to buy bonds even though Louis did not recall doing so. Louis' vague testimony was contradicted by George Malanga. George testified that he had a conversation with Schiffer in 1967 or 1968 concerning the purchase of bonds with checks that were due Mal Bros. He further testified that Schiffer delivered bonds to him in 1968, that he (George) told Louis and Alfred Malanga about the bonds, and that George, Louis, or both, placed *395 the bonds in a safe deposit box. We accept Schiffer's testimony that Louis and George knowingly participated in the check cashing and bond purchase scheme at the Broadway National Bank. Also, we believe this was done with Alfred's knowledge. We also reject petitioners' contention that Louis, George, and Alfred Malanga had no knowledge of the omission of income related to these six checks. Petitioners would have us believe that the failure to record in the sales journal the billings behind these checks occurred because Schiffer directed Friedman not to post them. Friedman's testimony, if credible, supports this position. Adding to the confusion, Schiffer testified that he thought the income was reported in 1968. Having determined that the Malanga brothers knew of, and Louis and George participated in, the check cashing and bond purchase scheme at Broadway National Bank, we believe the Malangas, Schiffer, and perhaps Friedman, acted together in fraudulently omitting the billings behind these six checks from income. In this regard, the check cashing and bond purchase scheme warrants further description. It was only by coincidence that the revenue agent uncovered the fact that *396 one Mal Bros. check was cashed at the Broadway National Bank. He then found these six checks through the bank's recordack system. Since they were not deposited or cashed at the bank where the partnership maintained its regular bank account, the scheme appears designed to avoid detection. Harvey Dembe, an officer at the bank, testified that the transactions were outside the authority of a teller in the normal banking process. Indeed, it was so much beyond the authorized function that the bank investigated the matter and Dembe expressed embarrassment in detailing it. Dembe also testified that by endorsing the checks as if Mal Bros. had an account, they would avoid the issuance of a Treasury Currency Report. Such reports are required for unusual amounts of cash going in or out of the bank and might attract the attention of the Internal Revenue Service. Petitioners argue that the irregular manner in which these six checks were handled at Broadway National Bank points to Schiffer's responsibility for this scheme. Among other items, we are told that Schiffer once did some work for Broadway National Bank. Such evidence, however, does not shift responsibility to Schiffer alone. As *397 we have already indicated, we believe Schiffer acted in cooperation with the Malangas. That Louis Malanga would testify that he thought Schiffer pocketed the proceeds of the checks, which George Malanga contradicted, suggests that petitioners' attempt to make Schiffer the scapegoat has been fabricated. We see little reason for Schiffer to have devised such a check cashing and bond purchase scheme and to have omitted the related billings from the partnership income of Mal Bros. on his own. Schiffer was only an accountant, not a partner. He turned these bonds over to the Malangas. We have no meaningful basis for concluding Schiffer embezzled any of these partnership funds. 25*398 We believe these acts were performed with the Malangas' direction. We also believe the Malanga brothers knew that their partnership income was underreported as a result of the omission of the billings behind the checks in issue. Louis, George, and Alfred Malanga were given at least monthly briefings on the financial position of Mal Bros., including cash flow, bank balances, and receivables. They also borrowed money from banks and had to present financial statements and were aware of the finances of Mal Bros. With this familiarity of the partnership business, they must have known that their partnership income for 1968 was hundreds of thousands of dollars in excess of what was reported. Compare Eck v. Commissioner,16 T.C. 511 (1951), affd. per curiam 202 F. 2d 750 (2d Cir. 1953), cert. denied 346 U.S. 822 (1953). Respondent has presented direct evidence of the participation by Louis and George Malanga in the fraudulent check cashing scheme. The record supports a finding that Louis, George, and Alfred Malanga were fully aware of the scheme and benefited from it to the extent of receiving the bearer bonds. The record indicates that Louis, George, and Alfred Malanga were active in the business *399 and as a regular routine were briefed on the financial matters of the partnership. Based upon the above factors and the cumulative weight of them, the evidence is clear and convincing that Louis, George, and Alfred Malanga knowingly and intentionally underreported their distributive shares of income from Mal Bros. for the year 1968 with the intent to evade payment of tax. Thus, the section 6653(b) addition to tax was properly invoked by respondent with respect to 1968 in docket Nos. 6848-73, 6850-73, and 6853-73. 26For 1969, respondent's basis for fraud is the alleged intentional underreporting by Louis, George, and Alfred Malanga (now deceased) of their partnership income from Mal Bros. as a result of the deduction of $1,176,848.71 as cost of goods sold on the partnership return for 1969. This amount, which has been stipulated as not properly deductible in 1969, is attributable to a list of items contained on a page of the purchase journal of Mal Bros. for 1969. Edward Schiffer, the accountant for Mal Bros., testified that he came to the partnership *400 in early January of 1970 with a preliminary report of taxes owed by the individual Malangas for 1969. He testified that after he gave the Malangas the preliminary report he was told that there were additional Mal Bros. expenses for 1969 that had not been taken into consideration. Thereafter Schiffer was given a list purportedly containing amounts due on unbilled estimates of subcontractors of Mal Bros. as of December 31, 1969. The document covering the claimed additional cost of goods sold was, according to Schiffer, prepared subsequent to a meeting attended by Art Weiss, Louis Malanga, and George Malanga. Schiffer testified that he never saw any bills to support the items deducted, but that he agreed to the addition to cost of goods sold. Dorothy Friedman prepared the purchase journal entries for 1969 that included these items. Friedman testified that she had never before received a list like this one and that it was unusual. Contrary to Schiffer's testimony, Friedman testified that Schiffer gave her the list from which she prepared the entries after coming out of a meeting with Art Weiss. (Normally, Weiss, the office manager, prepared the estimates of payables to be posted *401 and gave them to Friedman. Weiss testified that he might well have prepared a list of estimated amounts due but unbilled to subcontractors as of December 31, 1969, but he had nothing to do with treating the estimates as cost of goods sold for 1969). Further, Friedman could not remember issuing checks for these items although she normally would do so soon after making a purchase journal entry. Nevertheless the additional amount of $1,176,848.71, reflected on the list, was entered on the books as additional cost of goods sold for 1969. Also in contradiction to Schiffer's testimony, Louis and George Malanga testified that they never met with Schiffer or Weiss concerning the preparation of the estimates included in the list from which Friedman prepared the purchase journal entries in issue. After succeeding Schiffer as Mal Bros.' accountant in August 1970, Isidore Rosenblum reviewed Mal Bros.' 1970 records and saw some unusual balances listed as being due to subcontractors that were not being paid. Rosenblum testified that he discussed this with George Malanga and Art Weiss, but they knew nothing about it. Rosenblum found that these were not actual obligations as of 1969 and reversed *402 the original purchase entries in some way with the result that most, if not all, the "erroneous accrual" in 1969 was offset by higher taxable income reported in 1970. He also explained that the items in question for 1969 were eventually paid. As a possible explanation of what Rosenblum viewed as a bookkeeping error, for lack of better information, he said that large accruals at the end of the year were common in the construction business because subcontractors are notoriously late in providing estimates and the routine of bookkeeping may not get the liability in at the right time. Once again, we are faced with a confusing record in which the Malangas claim ignorance of bookkeeping and accounting matters and reliance upon their accountant, Schiffer, to exculpate themselves of fraud. We have real doubts about their claims, but we believe it cannot fairly be said that respondent has carried his burden of proving that Louis, George, and especially Alfred, Malanga knowingly and intentionally underreported their partnership income from Mal Bros. with the intent to evade payment of tax for 1969. Although we are suspicious of how the recording of the questioned purchases came about, respondent *403 has shown just two facts on his way to proving fraud.One, that the entries in the purchase journal were unusual compared to prior years (for which Rosenblum offered a plausible explanation), and two, that there was a meeting at which Schiffer was told that there were other expenses for 1969 that had not been taken into consideration. When Schiffer was given, or saw, the list of estimates, probably prepared by Weiss, he agreed that the estimates should go into cost of goods sold for 1969. We agree with petitioners that this may have been a misunderstanding and does not prove involvement of the Malanga brothers by clear and convincing evidence. Thus, the additions to tax under section 6653(b) do not apply here. The parties are in agreement that 1969 is an open year for Louis and Mildred Malanga, Estate of Alfred Malanga and Nancy Malanga, and George Malanga. Petitioners are in agreement that respondent's adjustment adding these estimates back into income for 1969 by reducing cost of goods sold is correct. Based upon our findings of no fraud for 1967 and fraud for 1968, the statute of limitations bars assessment and collection of the deficiencies in income tax and additions to tax *404 of the foregoing petitioners only with respect to 1967. Issues 7 and 8With respect to Salvatore, Inc., for its taxable year ended April 30, 1968, Catt Corp. for its taxable year ended September 30, 1967, and Malanka, Inc., for its taxable year ended January 31, 1968, respondent's basis for fraud is his determination that these petitioners knowingly and intentionally underreported their income for said years by claiming a fictitious expense of the Joint Venture for the four checks issued to Kantor Supply. We have found in Issues 1 to 3 that the checks were illegal kickbacks and were deducted from the Joint Venture income for the period ending September 30, 1967, with the intent to evade tax. We also find that all of the Joint Venturers were aware of the scheme and participated in it by underreporting their distributive shares of the Joint Venture net income on their own tax returns for the periods above mentioned. Those returns were fraudulent and respondent's additions to tax under section 6653(b) are sustained. With respect to Malanka, Inc., for its taxable year ended January 31, 1966, the alleged fraud consists of knowingly and intentionally claiming a fictitious expense of *405 $13,977.67 as due to Kantor Supply Co. A check was issued by Malanka, Inc., to Kantor Supply Co. in the first month of its subsequent taxable year for the accrued expense. Where an officer and a shareholder of a taxpayer commits fraud in dealing with the corporation's tax affairs, his fraudulent intent is imputed to the corporation. Ruidoso Racing Association, Inc. v. Commissioner,476 F. 2d 502 (10th Cir. 1973), affg. in part and revg. in part a Memorandum Opinion of this Court. The telling factor in concluding that Daniel Malanka filed the return of Malanka, Inc., for the taxable period ending January 31, 1966, with the intent to evade payment of tax is that he allegedly recalled aluminum porous pipe being delivered on a big rack truck by Kantor Supply Co. Since Kantor Supply Co. was a fictitious entity, Malanka's story obviously was fabricated to suit Malanka, Inc.'s needs.We believe this factor alone shows that the deduction claimed with respect to the Kantor Supply Co. check was taken with a fraudulent intent. Imputing this fraudulent conduct to the corporation, we have found that all or part of the underpayment of tax required to be shown on the tax return of Malanka, Inc., *406 for the taxable year ended January 31, 1966, was due to fraud with intent to evade payment of tax. Thus, the section 6653(b) addition to tax applies. From our finding of fraud, it follows that the statute of limitations does not bar assessment and collection of the deficiency in income tax and addition to tax of Malanka, Inc., for the taxable year ended January 31, 1966.Sec. 6653(b). Decisions will be entered for petitioners in docket Nos. 1731-76, 1732-76, and 1733-76.Decisions will be entered under Rule 155 in all other docket numbers.Footnotes1. Cases of the following petitioners are consolidated herewith: Louis Malanga and Mildred Malanga, docket No. 6848-73; C. Salvatore & Sons, Inc., docket No. 6849-73; Estate of Alfred L. Malanga, deceased, Edwin Shmerler, Isidore Rosenblum and Grace Paterno, Executors, and Nancy Malanga, docket No. 6850-73; the Catt Corporation, docket No. 6851-73; George Malanga, docket No. 6853-73; Louis Malanga and Mildred Malanga, docket No. 1731-76; Estate of Alfred L. Malanga, deceased, Edwin Shmerler, Isidore Rosenblum and Grace Paterno, Executors, and Nancy Malanga, docket No. 1732-76; and George Malanga and Estate of Anna Malanga, deceased, docket No. 1733-76.↩2. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.3. Joseph Catanesi, Philip Salvatore, Louis Malanga, and Daniel Malanka discussed Gallo's proposal before agreeing to it. Most of them had done business with Gallo before and knew him personally.↩4. Respondent concedes that this transaction had no effect on taxable income for 1968.↩5. A seventh check, from Robert Bossert & Co., Inc., in the amount of $5,967, was received in 1968 and not recorded on the books or included in income, but it was not cashed at the Broadway National Bank.↩6. Sec. 162(c)(1) provides: (c) Illegal Bribes, Kickbacks, and Other Payments.-- (1) Illegal payments to government officials or employees.--No deduction shall be allowed under subsection (a) for any payment made, directly or indirectly, to an official or employee of any government, or of any agency or instrumentality of any government, if the payment constitutes an illegal bribe or kickback or, if the payment is to an official or employee of a foreign government, the payment would be unlawful under the laws of the United States if such laws were applicable to such payment and to such official or employee. The burden of proof in respect of the issue, for the purposes of this paragraph, as to whether a payment constitutes an illegal bribe or kickback (or would be unlawful under the laws of the United States) shall be upon the Secretary to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud). No distinction has been drawn by the parties regarding whether the checks drawn to Kantor Supply Co. should be analyzed under sec. 61 and other authorities as a reduction in gross income for cost of goods sold, rather than as expenses under sec. 162(a), for those petitioners who treated the payments in that manner. See Max Sobel Wholesale Liquors v. Commissioner,69 T.C. 477↩ (1977).7. For convenience, petitioners will be used herein to refer to the petitioners associated with the Joint Venture, Mal Bros., or Malanka, Inc., as the case may be.↩8. The only authority cited by respondent for using judicial notice in the way suggested here is a footnote explanation of a puzzling record in Nunez v. Commissioner,T.C. Memo. 1969-216. Even there the Court cautioned that it could make no specific findings of fact on the basis of what appears in another opinion. See also Freshman v. Atkins,269 U.S. 121, 124↩ (1925).9. Question marks are used herein to indicate information that was not developed in the transcript admitted into evidence in this case.10. All rule references are to the Federal Rules of Evidence unless otherwise specified.↩11. The cases decided under Rule 804(b)(3) generally contain no inquiry into the declarant's awareness that his declaration was disserving, but in Workman v. Cleveland Cliffs Iron Co.,68 F.R.D. 562 (D. Ohio 1975), the court inexplicably thought the declarant himself must be aware that his declaration was against interest. The better test, given Rule 804(b)(3)'s use of the reasonable-man standard, seems to be whether the declarant "should have realized" or in fact "did realize" that the statement was against his interest. The California First District Court of Appeal so applied the reasonable-person standard required by the California statute in People v. Johnson,39 Cal.App. 3d 749, 761-62↩, 114 Cal. Reptr. 545, 553-54 (1974).12. We have no explicit evidence that Kantor was in fact dying when he testified but the parties assume this fact in arguing their positions.↩13. In contrast, we conclude that pretrial statements given by Kantor on Jan. 2, 1970, and Jan. 9, 1970, are not admissible hearsay. These statements were made largely in response to questions by an Assistant United States Attorney. Also appearing were attorneys for Kantor and special agents of the Internal Revenue Service. These statements antedated his testimony at the criminal trial. In these statements Kantor described the Kantor Supply Co. check-cashing scheme, but he stopped short of implicating himself in a crime or acknowledging a failure to report income. All he said was that, for a 5-percent fee, he cashed checks for and supplied false invoices to Joseph Biancone. In these January statements he explicitly stated he did not know what Biancone did with the cash he gave him, and that Biancone never discussed with him what he (Biancone) was using the money for. Also, there is no mention of whether Kantor's 5-percent fee was reported. Viewed at the time of their making, these January statements were not against Kantor's interest and are not admissible under Rule 804(b)(3). Nor are these January statements admissible under Rule 804(b)(5). Under that rule other statements not specifically covered by the hearsay exceptions (where the declarant is unavailable) are not excluded by the hearsay rule provided, among other conditions, the statements are more probative of the points for which they are offered than any other evidence which the proponent can procure through reasonable efforts. We believe these January statements, lacking cross-examination by anyone, are not as a probative regarding the Kantor payments as Kantor's prior testimony.↩14. Philip Salvatore and Joseph Catanesi so testified. ↩15. Louis Malanga, Philip Salvatore, Joseph Catanesi, and Daniel Malanka so testified. ↩16. The indictments in United States v. Addonizio,451 F. 2d 49 (3d Cir. 1972), charged extortion, and the Court of Appeals in its opinion discussed the difference between extortion and bribery, the first involving exaction of payments by duress, while the second involves payments voluntarily made to gain an advantage. We have no reason to think here that the Kantor payments were bribery. Whether illegal "kickbacks" as used in sec. 162(e) include extorted payments is not argued.17. Respondent conceded in his main brief that the 1968 Mal Bros. check for $47,500 to Kantor Supply Co. had no tax effect.↩18. For the 1968 Mal Bros. check for $47,500 to Kantor Supply Co., which respondent originally contested but now concedes had no tax effect, Rosenblum identified corresponding ponding entries on or about Feb. 6, 1968, of a cash receipt in the cash journal and in the sales journal for $47,500. The result therefore was a wash. This Kantor check too, according to Louis Malanga, was exchanged for a Gallo check as a favor to Gallo.↩19. These checks were in the amounts of $5,967, $5,000, and $18,581.88, respectively.↩20. Sec. 6653(b) provides: (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. ↩21. Secs. 6501(a) and (c)(1) provide: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * *(c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩22. The wash transaction was consummated for tax purposes only when the $50,000 received from Gallo was included in income for 1968. ↩23. Apart from the issues discussed in this report, the parties stipulated certain issues that result in deficiencies against these petitioners for 1967.↩24. A seventh check, the check from Robert Bossett and Co., discussed under Issue 4, was omitted from income but was not cashed at Broadway National Bank. Nothing in the record will support a finding of fraud as a result of this check.25. About $1,506,000 in checks were negotiated through Broadway National Bank (of which $608,284.26 was represented by the 1968 checks). Except for testimony by Rosenblum, the accountant who succeeded Schiffer, that he (Rosenblum) could not account for $60,000 of these checks, there is nothing to suggest Schiffer profited from the check-cashing and bond-purchase scheme. Even if he did, any profit he received might well have been a commission for his role in helping the Malangas hide the income.26. For reasons that are not clear from the record, the income related to these six checks was reported by the partnership in 1969.↩